### S. JARVIS ADAMS CO. v. KNAPP.

(Circuit Court of Appeals, Sixth Circuit. March 3, 1903.)

#### No. 1,133.

**1. CONTRACT IN RESTRAINT OF TRADE—CONSIDERATION.**

Where an employé of a corporation, on leaving its service, was entitled under his contract of employment to rights in certain stock of the company, held for his benefit, but the extent of his interest in the stock depended upon whether or not he left the company for the purpose of engaging in a competing business, the payment to him by the company of a sum in excess of that to which he would have been entitled if he left for such purpose is a sufficient consideration for an agreement by him not to enter into a competing business or to disclose its secret processes.

**2. SAME—VALIDITY—AGREEMENT AS INCIDENTAL TO SALE OF PROPERTY.**

An employé of a corporation on leaving its service had the right, under his contract of employment, to purchase a certain amount of stock which was held for his benefit, and upon the price of which dividends had been credited to him. *Held*, that a contract by which, in consideration of the payment to him of a sum of money, he surrendered his interest in the stock and his right to purchase the same, and agreed that for 10 years he would not engage in a competing business, nor disclose, use, or sell the secret processes used by the corporation in its business, was valid, the agreement in restraint of competition being for the protection of the value of the stock the equitable title to which he sold to the corporation.

**3. EQUITY PLEADING—SUFFICIENCY OF BILL—ALLEGATION OF BUSINESS SECRETS.**

A bill to enjoin the use by defendant, in violation of a contract, of processes and methods used by complainant in its manufacturing business, sufficiently alleges their character as business secrets, as against a general demurrer for want of equity, where it alleges that they were not generally known or understood by other manufacturers or by the public, and that defendant acquired his knowledge of them while an employé of complainant and its predecessor, and where it also sets out the contract, by which defendant agreed not to disclose such processes and methods to others.

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

The appellant, who was complainant in the court below, filed this bill for the purpose of obtaining an injunction restraining the defendant from manufacturing and selling, within the United States and east of Denver, Colo., certain special metallic castings described therein, and from using the processes used by the complainant in the manufacture of such castings, and for an accounting of previous manufacture and sales. The defendant demurred to the bill. The demurrer was sustained, and the bill dismissed.

The bill alleges, in substance, the following facts: In September, 1899, and for some time previously, a firm, styled S. Jarvis Adams & Co., were engaged in the manufacture and sale of certain articles made of iron or steel, by methods and processes not generally known to the public, at Pittsburg, Pa., where it had established a business and acquired a reputation. Certain parties, McKnight, Fownes, Speer, and Speer, contemplating the formation of a corporation and the purchase of the plant, business, and good will of the firm, and wishing to secure for the corporation the services of some of the employés of the firm, the defendant Knapp among them, who were familiar with the business and the methods and processes used therein, entered into the following written agreement with them:

"This agreement, made and entered into this twenty-eighth day of September, A. D. 1899, between Charles McKnight, H. C. Fownes, J. McK. Speer and J. Ramsey Speer, all of the city of Pittsburg, Pennsylvania, who have or are about to associate themselves together under the firm name of the S. Jarvis Adams Company, parties of the first part, and T. K. Miller, J. M. Bossert and S. A. Knapp, of the same place, parties of the second part, witnesseth:

"Whereas, the parties of the first part are about to purchase the plant of S. Jarvis Adams & Company, including both the real estate and their foundry business operated by said company; and

"Whereas, they are desirous of continuing in their employ the parties of the second part in the positions now held by them with the said S. Jarvis Adams & Company, or in some similar capacity or position of employment with the parties of the first part:

"Now this agreement witnesseth: That the parties of the first part agree to hold for the use and benefit of each of the said parties of the second part the sum of twenty-five thousand dollars ($25,000.00) respectively, of the capital stock of a corporation to be formed by the said parties of the first part, under the name of The S. Jarvis Adams Company, the capital stock of which is to be not more than six hundred thousand ($600,000.00) dollars, and until said corporation is formed, to hold for them such proportionate share of the business as the said allotment of capital stock bears to the entire capitalization mentioned. The stock thus to be held for the benefit of the said second parties is to remain unsubscribed in the treasury of the corporation, and an account is to be opened with each of the said second parties and all profits or dividends applicable to said stock is to be credited thereon and thus the stock is to be carried until fully paid out of the dividends or as hereinafter provided and upon its full payment in the manner mentioned certificates of stock are to be made out and delivered to each of the said parties for such number of shares as shall make up the sum of twenty-five thousand dollars ($25,000.00). The said second parties are also each to be employed about the business either in their present capacities or in such capacity or work as the said first parties shall designate or direct for the term of one (1) year from the first day of October, A. D. 1899, at the annual salary of twenty-five hundred ($2500.00) dollars, payable monthly.

"If, however, the said second parties, or any one or more of them, should prove unsatisfactory to the said first parties in the manner of the discharge of their duties which may be assigned to them, or in any other way or manner whatsoever, then the party so becoming unsatisfactory may be discharged and relieved of any further duties, but the party so discharged shall be entitled to receive the balance of his salary due to him for the full year's employ-

ment above designated at the rate named. In event of said discharge of any one or more of said second parties, the party so discharged shall also receive, in addition to his salary, the earnings upon his stock or interest, as shown by the books of the company, so as aforesaid set apart and held by the said first parties for him, to be estimated for such portion of the year as he may have actually served the said first parties. After the expiration of the first year as above mentioned, from October 1, A. D. 1899, the further employment of the said second parties shall be at the pleasure and discretion of the first parties, but, in the event of such discharge at any time after the expiration of the first year, the party so discharged shall receive his salary only for the portion of the year for which he may have actually rendered services down to the time of his discharge and he shall also, at the same time, transfer and set over by proper paper, his interest in the stock so as aforesaid held for him in the treasury of the company and shall receive therefor such amount as the said stock may be shown by the books to be then worth over and above the charges against it for the unpaid amount still due on the account opened between him and the parties of the first part. It being the purpose and intent of this agreement to give to each of said second parties in event of his discharge the book value of the stock held for him after subtracting from it the amount still due from him to the company, and the arrangement so specified is further to go into effect in event of death of any of the second parties or in case of their resignation; except, however, in case said resignation shall be for the purpose of entering a competing business, in which event the party so resigning shall receive back only the amount which has actually been credited to his stock account. When and in event of the stock becoming fully paid out of the earnings or dividends of the company, as above provided for, then certificates therefor shall duly be made out and issued to the said second parties, as and when the stock becomes fully paid and the stock shall then be held by said second parties free from this contract and in the same manner as other stock of the said company is held. The said second parties, or any of them, after the expiration of the first year, as aforesaid, may further make any payments which they may desire in addition to the earnings of the stock upon their respective stock accounts and receive proper credit therefor.

"And the said second parties do further covenant and agree each for himself that they will give their full time, energy and attention to the business and prosecution of the work which may be committed to them by the said first parties, to the best of their respective abilities.

"In witness whereof the said parties have hereunto set their hands and seals the day and year first above written.

| "Charles McKnight. | [Seal.] |
| "Henry C. Fownes. | [Seal.] |
| "J. McK. Speer. | [Seal.] |
| "J. Ramsey Speer. | [Seal.] |
| "T. K. Miller. | [Seal.] |
| "J. M. Bossert. | [Seal.] |
| "S. A. Knapp. | [Seal.]" |

A corporation was formed under the title of the S. Jarvis Adams Co., and the purchase was made. Knapp and the other parties named in the contract entered the service of the corporation, and the business went on until a month or two after the expiration of the first year, when the defendant gave notice of his intention to resign and withdraw from the company, and taking such share of the profits as had accrued to him. A controversy arose between him and the company in respect to the terms upon which such withdrawal should take place; the officers of the company believing that he was intending to withdraw for the purpose of going into a competing business, in which case he would not be entitled to take profits, but only pay for his services and the amount which he had been credited on his stock. But he denied that he had such purpose, and if so he was entitled to pay for his services and the value of his stock, less the amount unpaid upon it. To settle this controversy, the parties entered into the following agreement:

"This agreement, entered into this twelfth day of November, 1900, between Sanford A. Knapp, party of the first part, and The S. Jarvis Adams Co., its successors and assigns, party of the second part, witnesseth:

"That Sanford A. Knapp, having resigned from the employ of The S. Jarvis Adams Co., now covenants and agrees, in consideration of the sum of six thousand, four hundred and eighty and ninety-five hundredth ($6,480.95) dollars, to him in hand paid, that he will not directly or indirectly, as an individual or partner or as a stockholder, director or officer of any corporation, limited partnership or other concern, or as an employé of any corporation, limited partnership, or other concern, or any person or persons whatsoever, enter into the manufacture and sale, or either, or disclose or sell or use any of the processes or methods used by the said second party, in the manufacture of any of the specialties, viz.: Pipe Balls, Bell Dies, Tong Dies or Axle Boxes, now manufactured by said second party, for a period of ten (10) years from the date hereof, in that part of the United States east of a line drawn north and south through the city of Denver, Colorado.

"Should the first party engage in the foundry business, as an individual or in partnership with James M. Bossert, he reserves the right to use the aforementioned processes and methods in the manufacture of any castings except the specialties enumerated above.

"But should the said first party engage in the foundry business with any other partner or partners than the said James M. Bossert, or as an employé, stockholder, director or officer of any corporation, limited partnership, or other concern, then the prohibition as to the disposal, sale or use of the processes and methods, as outlined above, is to continue in force.

"The said Sanford A. Knapp, doth hereby assign and release to The S. Jarvis Adams Co., all right, title, interest in or claim upon any of the stock of The S. Jarvis Adams Co., and doth authorize the return of the said stock to the treasurer of the corporation.

"In witness whereof, we have hereunto set our hands and seals this twelfth day of November, 1900.　　　　　　　Sanford A. Knapp.　　[Seal.]

"The S. Jarvis Adams Company,
"Henry C. Fownes, Pres.
"Wm. C. Fownes, Jr., Sec."

Subsequently, and about July 1, 1901, Knapp, with Bossert and others, formed a partnership, and at Coshocton, Ohio, went into the business of manufacturing and selling the same specialties, using the methods and processes of the complainant which he had learned and acquired while in the service of the corporation and its predecessors. On September 27, 1901, the defendant and his associates formed a corporation under the name of the Coshocton Iron Company, Knapp becoming one of its directors, and continued the same business at Coshocton, using the same methods and processes, taking over the plant and business of their former firm. The complainant has built up a large business in said specialties, particularly in axle boxes, and sells them within the portion of the United States east of Denver. The defendant's business is a competing business within the same territory, and the defendant, as an officer of his corporation, promotes the competition. The demurrer to the bill was a general demurrer for want of equity.

Watson, Burr & Livesay, for appellant.

Bargar & Bargar and Pomerene & Pomerene, for appellee.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

SEVERENS, Circuit Judge, having made the foregoing statement of the case, delivered the opinion of the court.

The ground upon which this demurrer was sustained was that the contract of November 12, 1900, upon which the bill ultimately rests, had for its sole purpose the restraint of competition, and that it was therefore void because it was opposed to public policy. Still other

grounds are taken by the appellee in support of the decree. One, which reaches to the whole bill, is that the stipulations of the defendant, the violation of which is complained of, do not rest upon a legally sufficient consideration; and the other, which extends only to the stipulation not to disclose, sell, or use the complainant's methods and processes, is that it is not sufficiently alleged that they were trade secrets; and, further, that it is only vaguely stated what the methods and processes are.

We shall take these questions up in the following order: First, was there a sufficient legal consideration for the defendant's stipulation?

By the terms of the contract, Knapp, after the end of the first year, was entitled to the following rights and privileges: He had the right to resign from his employment. In case of his resignation, he was entitled to receive the proper proportion of his salary of $2,500 per annum. He was bound to assign his interest in the $25,000 of stock, and was thereupon entitled to receive such sum as the books should then show the stock to be worth, less the amount which remained unpaid upon it. If, however, he should resign for the purpose of going into a competing business, he would be entitled to receive his salary and the amount he had been credited upon his stock, which he would thereupon be required to transfer to the company. He could at that time become the absolute owner of the stock by completing the payment for it, and could have required certificates therefor, and would have held it "free from the contract." If he continued to perform his duty according to the contract, the company, having no valid reason for forfeiting his right, could not prevent him from exercising it.

In this situation, he gave notice of his intention to resign. The company believed he did so for the purpose of going into a competing business, and insisted on settling upon that basis, which would require that he be paid only his salary and what he had credited upon his purchase of stock. He denied that he had the purpose imputed to him, and demanded, in addition to his salary, the value of the stock as shown by the books, less the amount remaining unpaid upon it. They compromised their differences by making the contract of November 12, 1900, whereby the company agreed to pay Knapp the sum of $6,480.95; and in consideration thereof he agreed that he would not, directly or indirectly, enter into the manufacture or sale, or disclose or sell or use, any of the processes or methods used by the company in the manufacture of any of certain specialties, for the period of 10 years, within the described territory. And he thereby assigned and released to the company all right in or claim to the stock, and authorized the return thereof to the treasury of the corporation.

We cannot see any reason for doubting that his agreement not to enter into competition, and not to disclose, sell, or use the company's processes and methods, was supported by a sufficient consideration; and certainly the agreement to pay the money, and thereby compromise their differences, is not open to any legal objection.

Second, a further question is whether these stipulations were valid. It is said that the stipulation not to enter into competition was void because it was contrary to public policy. It may be admitted as

claimed, and as held by the court below, that "a bald covenant in restraint of trade, for which there is no other consideration than the payment of money for the obligation itself, without any purchase of the business, products, trade, or plant of the covenantor, is void." Assuming this to be a correct proposition, it is contended by the appellee that the consideration for this agreement "was a cash sum of money, part of which it is conceded was a debt owed by the complainant." But the stipulation in question was not the only object of the contract. We must look to the whole contract, and see what was the object and purpose of it, and what relation this particular stipulation bears to its other parts. The defendant had not yet sundered his relation to the company. He had, it is true, indicated his purpose to leave its service; but he still held the right to purchase the stock, and would continue to hold it until some adjustment was made which would result in its relinquishment. That result was effected by the stipulation in this contract that "the said Sanford A. Knapp doth hereby assign and release to The S. Jarvis Adams Co. all right, title, interest in, or claim upon any of the stock of The S. Jarvis Adams Co. and doth authorize the return of the said stock to the treasurer of the corporation." The recital, "Sanford A. Knapp having resigned from the employ of The S. Jarvis Adams Co.," means no more than that he had taken a step which required a settlement of their relations; and the settlement made was not upon the terms of the old contract, though the new one recognized that under the old contract Knapp had rights to the stock which by the new one he "assigned and released" to the company. The whole matter was in fieri until it was closed by the new contract of November 12, 1900. The substance of that contract was that the company was to pay to Knapp $6,480.95 for what it owed him for services, the surrender of his interest in the stock, and his agreement not to enter into competition with the complainant's business or to disclose or use its processes and methods.

If Knapp had fully paid for his stock and had acquired the legal title to it, we think there could be no doubt that upon the purchase of it by the corporation, assuming this to be permissible, the latter might lawfully obtain a stipulation from the seller not to do anything to depreciate its value, as by entering into competition or exposing the secret processes of its business. And we can perceive no difference in principle between such a case and one where the purchase is of a right to obtain its stock under an executory contract already partly performed. In the first instance, the thing purchased would be a legal title; in the latter, an equitable interest; but the right to purchase protection would rest upon the same ground in either case.

The underlying principle upon which the modern cases upon this subject are grounded is that, although one cannot stifle competition by a bargain having that purpose only, yet when he purchases something, or acquires some right, the value of which may be affected by the subsequent conduct of the seller, the purchaser may lawfully obtain the stipulation of the seller that he will refrain from such conduct. In the present case the stipulation would increase the value of the benefit purchased by the corporation, and it was associated with that contract in its essence and in its purpose. These consid-

erations seem to us to bring the case within the principle of those in which the validity of such stipulations has been maintained. The subject was elaborately discussed in the opinion of this court delivered by Judge Taft in the case of the United States v. Addyston Pipe & Steel Co., 29 C. C. A. 141, 85 Fed. 271, 46 L. R. A. 122, and we have no occasion to go over the ground covered by that opinion. That case did not call for an opinion, nor was any opinion expressed, upon precisely such circumstances as are found in this; but it seems to us that the principles there laid down upon much consideration are broad enough to affect and control the decision we ought to render here, and that they are not consistent with the conclusion reached by the Circuit Court upon the subject we are considering. The learned judge of the Circuit Court did not question the principles indicated as sound in the opinion in the Addyston Pipe & Steel Co. Case, but held that they were inapplicable for the reason that the contract in which the stipulations in question were embodied did not show that any interest was transferred which those stipulations supported. In this we think he erred.

In respect to the stipulation not to disclose, sell, or use the methods and processes of the complainant, we think the allegations of the bill, taken in connection with the contract of November 12, 1900, which by reference is made part of this bill, are sufficient to show that those methods and processes were trade secrets which he had no right to disclose or use. The allegations of the bill are that the defendant "had theretofore been in the employ of said S. Jarvis Adams & Co., and knew and understood the use of certain processes and methods employed by said firm in the manufacture of said specialties, which said processes were not generally known or understood by other manufacturers of said products, or by the public," and that the defendant was employed "partly by reason of his said knowledge." We think that this contains a fair implication that such processes and methods—which are substantially synonymous terms—were secrets of the business which the complainants took over, and that, when it is said that they were not generally known to the public, it was intended to distinguish between the knowledge of the company and its employés and the knowledge of the rest of the public. Especially do we think this the proper construction in view of the language of the contract to which the defendant was a party, wherein he expressly agrees that he will "not disclose any of the processes and methods" of the company. This is an admission of a positive character that such processes and methods were secret. Otherwise the stipulation was nugatory. As against a general demurrer for want of equity, it must be held that it sufficiently appeared that the processes were business secrets. Story's Eq. Plead. § 528.

Then, as to the suggestion that it is not stated what those processes were, we think the complainant was not required to state them. We know of no precedent for holding that a party must make public the secrets of his business in order to obtain protection against their unlawful disclosure. He would lose his right in endeavoring to save it.

The decree will be reversed, and the case remanded, with directions to allow the defendant to answer and to take further proceedings not inconsistent with this opinion.

DAY, Circuit Judge, participated in the decision of this case.