USM Corporation vs. Marson Fastener Corporation
& others.[1]

Suffolk.  March 5, 1979. — August 29, 1979.

Present: Hennessey, C.J., Quirico, Braucher, Kaplan, Wilkins, Liacos,
& Abrams, JJ.

*Trade Secret.   Unfair Competition.*

Based on subsidiary findings made by a master in an action by a corpora-
tion seeking an accounting for the alleged misappropriation of a trade
secret, this court concluded that the corporation took sufficient
reasonable steps to preserve the secrecy of the information embodied in
the machine containing the trade secret. [94-103]
A plaintiff who may not claim trade secret protection either because it
failed to take reasonable steps to preserve its secrecy or because the in-
formation, while confidential, is only "business information" may still
be entitled to some relief against one who improperly procures such in-
formation. [104]

Bill in equity filed in the Superior Court on March 8,
1965.

The suit was heard by *Garrity*, J., on a master's report.

The Supreme Judicial Court granted a request for direct
appellate review.

*George T. Finnegan (John M. Harrington, Jr.*, with him)
for the plaintiff.

*Robert F. Sylvia (James F. Ryan* with him) for the de-
fendants.

[1] Marson Corporation, Cooper-Lewis, Inc., Joe Cooper, Irving
Cooper, Louis S. Lewis, Frank Lahnston, MF Liquidating Corporation,
Mar Liquidating Corporation, Marson Corporation (Delaware), and
Marson Fastener Corporation (Delaware).

ABRAMS, J. The USM Corporation (USM) seeks an accounting for the alleged misappropriation of a trade secret contained in a machine used in the manufacture of blind rivets.[2] In addition, USM sought relief from each of the defendants by reason of their "wrongful acts" in misappropriating confidential information.

To defeat the claim of misappropriation of a trade secret, the defendants alleged that USM had not kept its information secret. Hearings were held before a master; one of the master's conclusions was that. although information embodied in the machine was "of a nature which would constitute it a trade secret if protected, [it] was not sufficiently guarded by USM to entitle USM to recover anything from the defendants."˙ A judge confirmed the master's report, ruling that "the Master's ultimate finding with respect to the adequacy of the measures taken by USM to guard the secrecy of the USM machine is supported by the evidence before the Master, consistent with his subsidiary and other general findings and correct as a matter of law." The judge then ordered the entry of judgment dismissing the complaint with prejudice. USM appeals. We allowed USM's application for direct appellate review.

The main thrust of USM's appeal is that it did pursue a course of conduct reasonably designed to preserve the secrecy of its trade secret. USM contends that it was error to conclude from the master's subsidiary findings that its complaint should be dismissed. USM avers that in any event it was improper to dismiss the complaint since the master's report indicates that the defendants acquired the information improperly. See Restatement of Torts § 759 (1939).

---

[2] As described in the master's report, "A blind rivet is a device composed of . . . a mandrel and a rivet body. The mandrel, a nail-like object, is inserted in the rivet body, a hollow cylinder with a flange at one end, so that the mandrel head rests against the nonflanged end of the rivet body and the mandrel projects beyond the flanged end." A blind rivet is used to fasten materials together. It "can be inserted and fixed from only one side of the materials to be fastened, a property which makes it a highly useful device."

We have reviewed the master's report and conclude that it was error for the judge to dismiss the complaint.[3]

We summarize the subsidiary findings of fact on which the master and the judge based their conclusions. Since 1950, USM has engaged in the manufacture and sale of blind rivets. In 1954, employees of USM began development of a new type of blind rivet assembly machine. Development of the machine was completed in 1959.

The USM blind rivet assembly machine ("USM machine" or "machine") is able "to provide a means of reliable and rapid assembly of mandrels and rivet bodies into rivets." USM claims that the combination and relationship of various parts of the machine, along with certain features incorporated into the machine, are the trade secrets and confidential information which the defendants have misappropriated.[4]

The master ultimately found that the development of the USM machine involved considerable time, effort and expense, that the development of the machine was relatively difficult, and that its "combination [of features] was unique and effective when devised and . . . did not constitute a

---

[3] The master's ultimate conclusions were based solely on his subsidiary findings of fact. "[W]here the master in his report sets forth all of the subsidiary findings upon which he bases an ultimate conclusion, it is the duty of the trial court, and of this court, to draw its own inferences from those findings." *Corrigan* v. *O'Brien*, 353 Mass. 341, 346 (1967). Therefore, it is open to this court, as it was to the judge, to reach its own conclusions from the master's findings. See *Jones* v. *Wayland*, 374 Mass. 249, 255 (1978); *Wormstead* v. *Town Manager of Saugus*, 366 Mass. 659, 660 (1975). See also *Samia* v. *Central Oil Co. of Worcester*, 339 Mass. 101, 122 (1959). Cf. *Blanchette* v. *Blanchette*, 362 Mass. 518, 522 (1972).

[4] We need not describe the details of USM's machine, since the central issue on appeal is the sufficiency of the measures taken by USM to protect the "trade secret" rather than the nature of the secret itself. Moreover, it is conceivable that "the USM machine, the special features thereof and the combination and interrelationship of those features" remain a trade secret. Accord, *Jet Spray Cooler, Inc.* v. *Crampton*, 377 Mass. 159, 163 n.6 (1979); *Space Aero Prods. Co.* v. *R.E. Darling Co.*, 238 Md. 93, 106, cert. denied, 382 U.S. 843 (1965). Cf. *Cataphote Corp.* v. *Hudson*, 444 F.2d 1313, 1317 (5th Cir. 1971) (generally, business information other than trade secrets also should not be detailed).

matter of public knowledge or of general knowledge in the industry." Therefore, the master properly concluded that the USM machine was of an appropriate nature to qualify it as a trade secret.[5]

The master also found that Joe Cooper, Irving Cooper, and Louis Lewis were the officers and directors of corporations which distributed USM blind rivets for a period of approximately one year. In 1961, after being denied an exclusive distributorship, the defendants decided to manufacture blind rivets in competition with USM, but they were dissatisfied with the performance of their own blind rivet assembly machines. Eventually, the defendants were able to construct a blind rivet assembly machine like the USM machine because the defendants hired Frank Lahnston, a former junior engineer at the USM Shelton plant and provided him with "a group of about 100 [blue] prints without identifying title blocks but which Lahnston recognized as prints of USM [parts] drawings of the USM Machine." By 1964, Lahnston had succeeded in constructing for the defendants a blind rivet assembly machine which was "substantially the same as the USM Machines."

However, the master concluded that USM was not entitled to claim trade secret protection for its machine because USM had taken inadequate precautions to preserve the

---

[5] The defendants objected to the master's conclusion that only the failure adequately to protect the information prevented USM from claiming trade secret protection. The judge found the master's conclusion, "amply supported and in fact compelled by the evidence before him," and overruled the defendants' objection. Before this court, the defendants have not argued the question whether the information is appropriate to qualify it as a trade secret. Thus the question may not be properly before us. Cf. *Lyons* v. *Elston*, 211 Mass. 478, 482 (1912); Mass.R.A.P. 16 (a) (4), as amended, 367 Mass. 919 (1975), 16 (b), 365 Mass. 860 (1974). Even if the question were properly here, we agree with the judge's ruling that the master's subsidiary findings amply warrant the conclusion that the information embodied in the USM machine was of an appropriate nature to qualify it as a trade secret. See *Jet Spray Cooler, Inc.* v. *Crampton*, 377 Mass. 159, 167 n.9 (1979); *Eastern Marble Prods. Corp.* v. *Roman Marble, Inc.*, 372 Mass. 835, 838-839 (1977); *Jet Spray Cooler, Inc.* v. *Crampton*, 361 Mass. 835, 840 (1972). Cf. *Jet Spray Cooler, Inc.* v. *Crampton*, 377 Mass. 159, 173 n.13 (1979).

secrecy of the USM machine. To reach this result, the master focused on the security measures taken at the USM plant in Beverly, where the USM machine was developed, and at the USM plant in Shelton, where the USM machines were in operation. We therefore summarize the master's findings relating to USM's security measures in some detail.

Between 1954 and 1959 USM carried out the development of its machine at the Beverly plant. The Beverly plant was fenced, and employees and visitors entered the plant through guarded gates. Once inside the plant, employees were expected to remain in their immediate work areas. Supervisors questioned any employee who was discovered outside the employee's work area. While employees were not to remove objects from the plant without permission, guards did not generally inspect employees' briefcases or lunch boxes as they left the plant.

Visitors to the plant were logged in and out. They were also required to state their business and to wait in a designated reception area. At no time were visitors permitted to walk unescorted through the plant.

During the period of their development, the USM machines were located in a relatively isolated area of the Beverly plant, but USM employed no special security precautions to prevent access to the machines. At all times both during and after their development, USM treated the machines as items of factory equipment. "The term 'factory equipment' defines machines and other equipment developed or adapted by USM to be used internally in production of items to be sold to others and not themselves to be sold or otherwise made available to third persons."

All drawings and blueprints of parts for the USM machines were kept in the engineering department of the Beverly plant, along with 250,000 other drawings of factory equipment. No assembly drawings were ever made for the USM machine. Whenever a print of a particular drawing was required for work being done outside the engineering department, the employee needing the print was to complete a written production order. After receiving the work

order, engineering employees stamped the print with the work order number and the phrase "for the above only" before delivering the print to the employee. However, while some USM blueprints were stamped "confidential," no drawings, blueprints, or prints of the USM machine were stamped "confidential" prior to the filing of the complaint in this action.

After USM completed the development of the USM machine, some of these machines were installed at the USM plant in Shelton, Connecticut. With a few variations, USM security precautions at the Shelton plant were similar to those in force at the Beverly plant.

Employee entrances at the Shelton plant were unguarded, and employees did not wear badges. All doors were locked during hours when the plant was not operating, and any employee entering the plant outside of regular working hours was required to have a pass and to be logged in by the watchman.[6]

Visitors to the Shelton plant were always logged in and waited in a reception room which was separated from the production area by an opaque partition. Visitors entering the production area were expected to be escorted at all times.

The USM machines at the Shelton plant were located in the production area of the plant. They were not separated from other plant operations and were visible from the shipping room doors. A set of reproducible drawings for the USM machine was kept at the Shelton plant. The drawings were located in the office of the engineering department, which was separated from the production area by a lockable door.

USM conducted occasional plant tours at Shelton. The tours, however, did not open the plant to the general public

---

[6] The defendant Lahnston was not required to follow this procedure.

and were conducted for the families of employees and for distributors of USM products.[7]

All supervisory, technical, and engineering employees at the Shelton plant signed nondisclosure agreements in early 1963.[8] Similar agreements were signed by research personnel at the Beverly plant.

USM generally did not seek patent protection for any items of factory equipment and sought no such protection for the USM machine or for any of its components. There was also no written policy specifically prohibiting disclosure of information concerning factory equipment, and prior to November, 1963, no USM officer published a formal statement identifying the USM machine or its components as confidential information.

The master concluded that these security precautions did not entitle USM to claim trade secret protection for the USM machine, measured against a standard of conduct which required USM to "exercise a degree of eternal vigilance or pursue an active course of conduct sufficient to maintain the secrecy of the information embodied in the USM Machine."

USM argues that the master's subsidiary findings of fact establish that USM took reasonable precautions to maintain the secrecy of its information, and that such reasonable precautions are all that are required to entitle a plaintiff to claim trade secret protection for its information. Thus

---

[7] Cooper-Lewis, Inc., became a wholesaler of USM blind rivets in 1960. Shortly thereafter, Irving Cooper and Joe Cooper, officers of Cooper-Lewis, Inc., toured the USM plant in Shelton. At the time the Coopers toured the Shelton plant in 1960, they were unescorted for much of the time. However, "[t]hey did not, and no observer could, determine the internal construction of the various internal features of the USM machine."

[8] In pertinent part, the nondisclosure agreement provides that: "I further agree that I will carefully guard and keep secret all confidential information which does or may concern the business and affairs of [USM], and at no time while in the employ of said Corporation or thereafter shall disclose any such information without first securing the written consent of said Corporation. I also agree that all documents or other data relating to the business of said Corporation which shall come into my possession shall be surrendered upon request whether before or after my employment shall have ceased."

USM asserts that the defendants' use of this information constituted a misappropriation of USM's trade secrets and confidential information for which the defendants should be held liable. We agree.

One who possesses a trade secret and wishes to protect it must act to preserve its secrecy. See *Peabody* v. *Norfolk*, 98 Mass. 452, 458 (1868); Restatement of Torts § 757, Comment b (1939). See also *United States Plywood Corp.* v. *General Plywood Corp.*, 370 F.2d 500, 508 (6th Cir. 1966), cert. denied, 389 U.S. 820 (1967); *Future Plastics, Inc.* v. *Ware Shoal Plastics, Inc.*, 340 F.Supp. 1376, 1382 (D.S.C. 1972); *Hamilton Mfg. Co.* v. *Tubbs Mfg. Co.*, 216 F. 401, 404 (W.D. Mich. 1908); *Gallowhur Chem. Corp.* v. *Schwerdle*, 37 N.J. Super. 385, 397 (1955). Cf. *Republic Sys. & Programming, Inc.* v. *Computer Assistance, Inc.*, 322 F.Supp. 619, 628 (D. Conn. 1970), aff'd, 440 F.2d 996 (2d Cir. 1971); *Bristol* v. *Equitable Life Assurance Soc'y*, 132 N.Y. 264, 267 (1892).

However, where a plaintiff has actively sought to protect its trade secret, the question then becomes whether the protective measures are reasonable. "Reasonable precautions against predatory eyes we may require, but an impenetrable fortress is an unreasonable requirement, and we are not disposed to burden industrial inventors with such a duty in order to protect the fruits of their efforts." *E.I. duPont deNemours & Co.* v. *Christopher*, 431 F.2d 1012, 1017 (5th Cir. 1970), cert. denied, 400 U.S. 1024 (1971). See *Greenberg* v. *Croydon Plastics Co.*, 378 F.Supp. 806, 813-814 (E.D. Pa. 1974); *Allen Mfg. Co.* v. *Loika*, 145 Conn. 509, 516 (1958); *RTE Corp.* v. *Coatings, Inc.*, 84 Wis.2d 105, 115 (1978). Cf. *Structural Dynamics Research Corp.* v. *Engineering Mechanics Research Corp.*, 401 F.Supp. 1102, 1117 (E.D. Mich. 1975); *Dior* v. *Milton*, 9 Misc. 2d 425, 439 (Sup.Ct.), aff'd, 2 App. Div. 2d 878 (N.Y. 1956). See also R. Ellis, Trade Secrets § 41 (1953) ("A course of conducting business which necessarily implies a desire on the part of the employer that the information in question is to be kept secret is sufficient"). See generally Hutter, Trade Secret

Misappropriation: A Lawyer's Practical Approach to the Case Law, 1 W. New England L. Rev. 1, 17 (1978); R.M. Milgrim, Trade Secrets § 2.04 (1978).

No general rule may be established to determine whether the security precautions taken by the possessor of a trade secret are reasonable.[9] "Relevant factors to be considered include (1) the existence or absence of an express agreement restricting disclosure, (2) the nature and extent of security precautions taken by the possessor to prevent acquisition of the information by unauthorized third parties, (3) the circumstances under which the information was disclosed . . . to [any] employee to the extent that they give rise to a reasonable inference that further disclosure, without the consent of the possessor, is prohibited, and (4) the degree to which the information has been placed in the public domain or rendered 'readily ascertainable' by the third parties through patent applications or unrestricted product marketing." *Kubik, Inc.* v. *Hull*, 56 Mich. App. 335, 356 (1974). Additionally, a court should consider the relationship and the conduct of the parties. We think it appropriate to balance a plaintiff's conduct in maintaining its security measures against the conduct of a defendant in acquiring the information. See Restatement of Torts § 757, Comment b (1939) ("a substantial element of secrecy must exist,

---

[9] The significance of the security precautions taken by the possessor of a trade secret must be viewed in the context of the law of trade secrets, taken as a whole. "There are numerous factors to be considered in determining whether an alleged trade secret will be protected. Such factors include: (a) The expenditure of money, time, and labor in developing the trade secret; (b) The novelty of the secret; (c) The question whether the secret is in fact a secret; (d) The conscious and continuing effort by the proprietor to maintain secrecy, including the prevention of unauthorized disclosure by employees; (e) The value of the secret to the proprietor's business; (f) The extent to which the trade secret may be isolated by analysis and known procedures and (g) The relationship between the parties having knowledge of the secret." A.H. Siedel & R.L. Panitch, What the General Practitioner Should Know about Trade Secrets and Employment Agreements 12 (1973). See, e.g., *Jet Spray Cooler, Inc.* v. *Crampton*, 377 Mass. 159, 167 n.9 (1979).

so that, except by the use of improper means, there would be difficulty in acquiring the information").

The master's subsidiary findings reveal that the information which USM seeks to protect is embodied in certain features of the USM machine, including the internal configuration and arrangement of various component parts. Because this information relates to the machine itself, the marketing of the blind rivets produced by the machine would not disclose the information which USM seeks to protect. Disclosure of this information requires either extended access to the machine itself or access to the detailed parts drawings.[10]

USM required supervisory, technical, and research personnel, including the defendant Lahnston, to sign nondisclosure agreements. See note 8, *supra*. While the nondisclosure agreements did not list the particular information which USM considered secret, such specificity is not required to put employees on notice that their work involves access to trade secrets and confidential information. See *Eastern Marble Prods. Corp.* v. *Roman Marble, Inc.*, 372 Mass. 835, 840 (1977); R. Callmann, Unfair Competition, Trademarks and Monopolies § 53.3, at 390 (3d ed. 1968 & Cum. Supp. 1978). Accord, *Kodekey Elecs., Inc.* v. *Mechanex Corp.*, 486 F.2d 449, 455 (10th Cir. 1973) (nondisclosure agreements a "primary and essential precaution"); *S. Jarvis Adams Co.* v. *Knapp*, 121 F. 34, 40 (6th Cir. 1903); *Ultra-Life Laboratories, Inc.* v. *Eames*, 240 Mo. App. 851, 866 (1949).

In the work environment at USM, where employees are on notice that their work may involve access to trade secrets and confidential information, there can be little question

---

[10] The master found that "an observer could not determine either the precise nature of the components included in the particular features . . . or the dimensions and precise relationship of such features without reference to the drawings of such features or without somehow cutting the parts up so as to examine their internal configuration. Without reference to the drawings of the USM Machine or an opportunity for examination of the internal configuration of its parts, an independent designer would not duplicate [these features]."

that the USM employees knew or should have known that detailed parts drawings and blueprints for factory equipment were considered confidential by their employer.[11] "[I]t is well settled that detailed manufacturing drawings . . . are prima facie trade secrets." *A.H. Emery Co.* v. *Marcan Prods. Corp.*, 389 F.2d 11, 16 (2d cir.), cert. denied, 393 U.S. 835 (1968). See *Schulenburg* v. *Signatrol, Inc.*, 33 Ill. 2d 379, 386-388 (1965), cert. denied, 383 U.S. 959 (1966). It is not fatal that the blueprints and parts drawings were not labeled "confidential" or "secret" or that USM had not expressly informed its employees that these part drawings were considered secret by USM. See *A.H. Emery Co.* v. *Marcan Prods. Corp.*, *supra*; *Affiliated Hosp. Prods.* v. *Baldwin*, 57 Ill. App. 3d 800, 808 (1978). Cf. *Nucor Corp.* v. *Tennessee Forging Steel Serv., Inc.*, 476 F.2d 386, 392 (8th Cir. 1973).

Similarly, the plant security precautions taken by USM were sufficient to exclude the general public from the production areas of USM's plants, thereby denying access to USM factory equipment, including the USM machine. The fact that USM conducted escorted tours for employees' families and USM product distributors, including certain defendants, does not militate against a finding that USM denied public access to the USM machine. Compare *Plant Indus., Inc.* v. *Coleman*, 287 F.Supp. 636, 643 (C.D. Cal. 1968) (tours by women's clubs and customers' representatives do not constitute failure to maintain secrecy) and *Franke* v. *Wiltschek*, 209 F.2d 493 (2d Cir. 1953) (defendants' tour of plant while negotiating to sell plaintiffs' products does not destroy secrecy), with *Motorola, Inc.* v. *Fairchild Camera & Instrument Corp.*, 366 F.Supp. 1173, 1186 (D. Ariz. 1973) (security inadequate where competitors toured plant, operated "secret" machine and "observed

---

[11] The master found that when Joe Cooper called Lahnston to the Marson Fastener office and showed Lahnston the blueprints, "Lahnston became concerned about the agreement he had signed at [USM] Shelton . . . and was told not to worry."

its 'secret' process in a separate microscope placed there for this purpose") and *Hamilton Mfg. Co.* v. *Tubbs Mfg. Co.*, 216 Fed. 401, 404 (W.D. Mich. 1908) (public generally not excluded from production area). See *Watercolor Group* v. *William H. Newbauer, Inc.*, 468 Pa. 103, 111-112 (1976). See also *Junker* v. *Plummer*, 320 Mass. 76, 78 (1946); *L.M. Rabinowitz & Co.* v. *Dasher*, 82 N.Y.S.2d 431, 437-438 (Sup. Ct. 1948).

We do not require the possessor of a trade secret to take heroic measures to preserve its secrecy.[12]   Rather, "if the person entitled to a trade secret wishes to have its exclusive use in his own business, he must not fail to take all proper and reasonable steps to keep it secret.  He cannot lie back and do nothing to preserve its essential secret quality." *J.T. Healy & Son* v. *James A. Murphy & Son*, 357 Mass. 728, 738 (1970).  See *Jet Spray Cooler, Inc.* v. *Crampton*, 361 Mass. 835, 841 (1972).  The question whether a plaintiff has taken "all proper and reasonable steps" depends on the circumstances of each case, considering the nature of the information sought to be protected *as well as the conduct of the parties.*  See Hutter, Trade Secret Misappropriation: A Lawyer's Practical Approach to the Case Law, 1 W. New England L. Rev. 1, 17-18 (1978); 10 Z. Cavitch, Business Organizations § 233.01[3](5), at 233-27 (1978).  Cf. *Jet Spray Cooler, Inc.* v. *Crampton*, 361 Mass. 835, 840 (1972).

---

[12] "[I]ndustrial security procedures need to be *optimized* rather than *maximized.*  Beyond the optimum point, the direct and indirect costs of further security outweigh the value of the protection."  Popper, What Price Secrecy, Pulsebeat 3, 4 (Spring, 1968) (discussing commercial inefficiency resulting from elaborate trade secret security measures). See Note, Trade Secrets, 7 B.C. Indus. & Com. L. Rev. 324, 325 (1965) (monetary cost of elaborate security diverts funds from research). However, there is no hard and fast rule as to what constitutes an "optimum" program to protect trade secrets. See, e.g., Schneider & Halstrom, A Program for Protecting Proprietary Information, 18 Prac. Law. 71, 73-80 (1972); Vandevoort, Trade Secrets:  Protecting a Very Special "Property," 26 Bus. L. 681, 685-688 (1971); LuKacher, Protection against Loss of Proprietary Information Through the Activities of Former Employees, 40 N.Y. St. B.J. 478, 479-480 (1968).

Applying this standard, we denied trade secret protection in *Healy* because the plaintiff had made a conscious policy decision to do nothing to safeguard the confidentiality of its manufacturing processes. *J.T. Healy & Son* v. *James A. Murphy & Son, supra* at 736-738. In *Healy*, the employees were never informed that any of the manufacturing processes were considered secret; employees were not required to sign nondisclosure agreements; the plant was not partitioned into sections; and employees engaged in other work could plainly see the two "secret processes" in operation. *Id.* at 736-737. The plaintiff in *Healy*, other than excluding the general public from the manufacturing plant, took no security precautions whatever. See *id.* at 738-739.

By contrast, in *Eastern Marble Prods. Corp.* v. *Roman Marble, Inc.*, 372 Mass. 835 (1977),[13] trade secret protection was afforded a plaintiff who not only enforced a separation of the manufacturing area of the plant from the public area but also required all manufacturing employees "to sign an agreement not to disclose the methods and procedures involved in the [plaintiff's] manufacturing processes." *Id.* at 840. While the nondisclosure agreements did not specifically refer to the particular manufacturing processes claimed as trade secrets, we observed that "this agreement by its terms included all the proprietary and secret information involved in the manufacturing process. Such an agreement cannot be disregarded as an empty formality. At the very least it put the employees on notice that secrets were involved." *Id.*

We think that, considering the character of the information which USM sought to protect, the steps taken by USM to preserve the secrecy of its trade secret were reasonable. Accord, *Eastern Marble Prods. Corp.* v. *Roman Marble, Inc., supra.* Until the defendants acquired a set of USM

---

[13] Our opinion in *Eastern Marble Prods. Corp.* v. *Roman Marble, Inc.*, 372 Mass. 835 (1977), was announced subsequent to the date on which the master filed his report but prior to the time the judge entered his "Findings, Rulings and Orders."

machine parts drawings and a former USM employee,[14] the defendants' efforts to construct a satisfactory blind rivet assembly machine had been unsuccessful.[15]  In short, USM's "efforts at secrecy, like the process itself, met the basic criterion of success." *Space Aero Prods. Co.* v. *R.E. Darling Co.*, 238 Md. 93, 112, cert. denied, 382 U.S. 843 (1965). See Restatement of Torts § 757, Comment b (1939).

Since we have concluded that USM took sufficient reasonable steps to preserve the secrecy of the information embodied in the USM machine, and that USM is entitled to claim this information as a trade secret, the judge's dismissal of the complaint in this action must be reversed.

We think it necessary to comment on the judge's action in dismissing the complaint without ruling on the master's finding that Cooper had utilized improper means to procure information about the USM machine.  Although we need not base our conclusion on the master's finding of impropriety on the part of Joe Cooper, we will not condone such conduct by our silence.

---

[14] The master found that USM never made an assembly blueprint for the USM machine, and that no USM machine was ever constructed by one not thoroughly familiar with it.  "The USM machine was assembled by using a parts catalogue compiled by the USM Engineering Department. To assemble the machine one would follow the sequence of the parts listed in the catalogue."  The master found as a fact that no assembly blueprint existed and that this fact "contributed to the difficulties Lahnston experienced in trying to assemble the . . . [blind rivet assembly] machine so that it would operate."  Apparently, the defendants did not obtain a copy of the parts catalogue.

[15] Neither the master nor the judge considered the defendants' conduct as bearing on the reasonableness of the plaintiff's security precautions. However, it is clear from the master's report that the process contained in the USM machine was neither generally known nor known within the industry.  The master found that Joe Cooper's acquisition of the USM blueprints was improper.  Cooper's conduct should have been considered by the master and the judge in assessing the reasonableness of USM's security precautions. See Restatement of Torts, § 757, Comment b (1939).  See also *Solo Cup Co.* v. *Paper Mach. Co.*, 240 F.Supp. 126, 141 (E.D. Wis. 1965), aff'd in part, 359 F.2d 754 (7th Cir. 1966) (absence of satisfactory explanation of defendants' acquisition of plaintiff's drawings).

A plaintiff who may not claim trade secret protection either because it failed to take reasonable steps to preserve its secrecy or because the information, while confidential, is only "business information," may still be entitled to some relief against one who improperly procures such information. The law puts its imprimatur on fair dealing, good faith, and fundamental honesty. Courts condemn conduct which fails to reflect these minimum accepted moral values by penalizing such conduct whenever it occurs. *Seismograph Serv. Corp.* v. *Offshore Raydist, Inc.*, 135 F.Supp. 342, 354-355 (E.D. La. 1955), modified on other grounds, 263 F.2d 5 (5th Cir. 1958) ("It is simply the difference between right and wrong, honesty and dishonesty, which is the touchstone in an issue of this kind"). See Restatement of Torts § 759 & Comment b (1939); *McDonald's Corp.* v. *Moore*, 243 F.Supp. 255, 258 (S.D. Ala. 1965), aff'd, 363 F.2d 435 (5th Cir. 1966) (holding defendants liable for the "improper acquisition and copying of the [plaintiff's] operational manual"). See also *Crocan Corp.* v. *Sheller-Globe Corp.*, 385 F.Supp. 251, 254-255 (N.D. Ill. 1974) ("improper means used to gain information is a separate basis of liability, regardless of whether the information constitutes a technical trade secret"). Accord, *Dr. Miles Medical Co.* v. *John D. Parks & Sons*, 220 U.S. 373, 402 (1911); *Board of Trade of Chicago* v. *Christie Grain & Stock Co.*, 198 U.S. 236, 250 (1905).[16]

---

[16] In cases where allegations of the misuse of trade secrets involve the activities of former employees, the major issue is generally not whether the defendant improperly acquired the information but whether the former employee may use or disclose information properly acquired. See, e.g., *Eastern Marble Prods. Corp.* v. *Roman Marble, Inc.*, 372 Mass. 835, 840-842 (1977); *Jet Spray Cooler, Inc.* v. *Crampton*, 361 Mass. 835, 840-841 (1972). See also Restatement (Second) of Agency §§ 395-396 (1958).

The judgment is reversed.  This action is remanded to the Superior Court for further proceedings consistent with the master's report and with this opinion.[17]

*So ordered.*

---

[17] Having recommended that the action be dismissed, the master, on the chance that he might be held wrong, went on to an accounting of profits of those defendants which had produced rivets with the use of the plaintiff's alleged secret.  (The plaintiff stipulated that it would not seek "damages" against these defendants, i.e., recovery for any loss suffered by it through diversion of customers or the like.)  The accounting was for operations in Massachusetts from January 1, 1964, to December 31, 1972; accounting for operations in Massachusetts after 1972, and for operations elsewhere from 1964, was reserved and has not yet taken place. (The accounting made showed the defendants' pre-tax "relief income" of $1,252,910. The plaintiff's costs proved by it attributed to "development" were but $31,699.)  Agreeing with the master's main recommendation, the judge below did not pass on the accounting. A minority of the court ventures the following comments regarding the accounting.  Operating expenses of these defendants are properly allowed. So are allocable taxes.  On remand, the defendants, in fairness, will be free to attempt to establish in the accounting any other deductions appropriate to rendering the ultimate recovery a sound reflection of their unjust enrichment due to the exploitation of the secret, and no more. Thus they may attempt to define just what was preserved in reasonable secrecy and to show what profits, if any, are attributable not to that secret so defined but to superior management skills.  A majority of this court, including the author of this opinion, expresses no opinion on the issue of the accounting as it was not decided below nor briefed or argued before this court.

As to any further evidentiary hearings, "[a]lthough we have noted the discretion reposed in a trial court judge to refer cases to masters . . . we now add that we consider it desirable that the [Superior] Court give serious consideration to the expeditious completion of the trial of this case before a judge in order to avoid any further delay which seems to be inherent in the reference of cases to masters . . . ." *O'Brien* v. *Dwight*, 363 Mass. 256, 298 (1973).