**DB RILEY, INC., Plaintiff,**

v.

**AB ENGINEERING CORP., and AJEC Engineering, Inc., Defendants.**

**Civil Action No. 97–40144–NMG.**

United States District Court,
D. Massachusetts.

Sept. 18, 1997.

---

David P. Grossi, Bowditch & Dewey, Worcester, MA, for DB Riley, Inc.

James C. Donnelly, Jr., Joan O. Vorster, Mirick, O'Connell, DeMallie & Lougee, Worcester, MA, for AB Engineering Corp., AJEC Engineering Inc.

### MEMORANDUM AND ORDER

GORTON, District Judge.

Plaintiff, DB Riley, Inc. ("Riley") moves, pursuant to Fed.R.Civ.P. 65(a), for a preliminary injunction to enjoin the defendant, AJEC Engineering, also known and doing business as AB Engineering Corp. ("AJEC") from

(1) selling, distributing or using Riley parts, including parts already in AJEC's inventory and control;

(2) using or copying specifications, drawings, patterns, dies or other manufacturing data concerning Riley parts and/or Riley equipment;

(3) using information relating to the manufacture and use of Riley parts, including purchasing, pricing, supply and application information relating to customers of Riley parts;

(4) contacting Riley customers for any purpose; and

(5) using the name Riley.

Furthermore, Riley seeks an order requiring the return of all manufacturing information which AJEC has ever received from Riley. For the reasons set forth in this memorandum and order, the motion for a preliminary injunction will be denied.

## I. *Background*

### A. *The Parties*

Riley, a Massachusetts corporation with a principal place of business in Worcester, Massachusetts, manufactures, sells and installs large industrial/commercial boiler systems as well as replacement parts for its boiler units.

AJEC, also using the trade name of AB Engineering, Corp., is a Massachusetts corporation with a principal place of business in Oxford, Massachusetts. It was founded in 1967 by Alfred Beland and is a machine tool company which competes in the secondary market of replacement parts for Riley equipment. AJEC describes its relationship to Riley as similar to the relationship between companies like Genuine Parts and NAPA, on the one hand, and auto manufacturers such as Ford, GM and Chrysler on the other.

### B. *The Claims*

Riley's complaint is for breach of contract, misappropriation of trade secrets, breach of implied warranty of good faith and fair dealing, conversion of tangible personal property, interference with advantageous business relations, unfair and deceptive business practices (M.G.L. ch. 93A, §§ 2 and 11) and violations of the Lanham Act (15 U.S.C. § 1125(a)).

### C. *Procedural History*

The complaint and motion for a preliminary injunction was filed in state court on July 21, 1997. The case was removed pursuant to 28 U.S.C. § 1331 on July 30, 1997 by defendant which filed its answer on that same day. Plaintiff refiled its motion for a preliminary injunction in federal court to-

gether with copies of its supporting papers and defendant filed its opposition thereto on August 8, 1997.

### D. *Relevant Facts*

Riley is a leading manufacturer of large industrial boilers of the kind that are used by utilities and other large industrial companies to generate power. Riley also manufactures fuel systems that are designed to grind coal into powder and then blow the pulverized coal into boilers where it is consumed as fuel. Such fuel systems include large machines known as "ATRITA pulverizers" which require regular maintenance and the replacement of worn and broken parts. Riley has often contracted with other companies to manufacture parts for them. In the mid–1970s AJEC began to manufacture and repair replacement parts for Riley equipment based upon orders from several machine tool companies, including Sjogren Tool & Mfg. Co. ("Sjogren").

In 1986, Sjogren filed for protection under the bankruptcy laws and, according to AJEC, liquidated its assets. Among those assets were: 1) a complete set of Riley shop drawings, 2) specifications for all of the replacement parts which Sjogren had manufactured for Riley in the past, 3) automated machine tool equipment along with electro-magnetic tapes which programmed the equipment to manufacture Riley and other company parts and 4) "CNC Printouts" which were the printed formats of the same information, all of which AJEC bought at auction in April, 1986.[1] AJEC claims Riley was aware of that purchase and could have bought the equipment and drawings itself or prevented their disposal at auction if legally possible. Riley responds that it had a contractual relationship with Sjogren wherein Sjogren acknowledged the confidentiality and proprietary nature of the material and information that it obtained from and returned to Riley prior to its bankruptcy.

In March, 1986, AJEC contacted Riley directly informing Riley that AJEC had unfinished work on Riley parts which AJEC had

---

1. Sjogren's assets by that time were owned by a third party, MFA, Inc. and the auction was conducted for its benefit.

been preparing for Sjogren prior to its bankruptcy. Riley asked AJEC to continue the work and entered into a business relationship with AJEC whereby Riley began to purchase parts directly from AJEC in the summer of 1986.

Riley commissioned work by AJEC through the use of printed purchase orders. Those orders were usually accompanied by three copies of shop drawings for the part being ordered. It was AJEC's practice to file one copy with the job ticket for future reference in case of problems with the part and to discard the other two copies.

The reverse side of the purchase orders, which were never signed by AJEC, contained conditions of the sale in relatively fine print informing the supplier (here AJEC) that information provided by Riley was confidential and that the shop drawings were to be returned to Riley upon request.[2] The purchase order itself provided that acceptance of the order was subject to the terms on the reverse side.[3] On the front of shop drawing specifications was the statement: "This print is the property of Riley Stoker Corporation and is not to be used in any way injurious to its interests and is to be returned upon request." AJEC asserts that such a statement and even more strongly worded proprietary statements meant very little to people in its industry and were largely ignored by all.

On several occasions Riley proposed a formal supply agreement with AJEC that would have included confidentiality provisions, but with one immaterial exception, AJEC declined to sign such documents. AJEC asserts that other machine tool companies had copies of the Riley drawings which they did not treat as confidential and a few of which AJEC has purchased. Riley vigorously denies the assertion, explaining that, to its knowledge, none of the companies mentioned had Riley's proprietary drawings unless they had them pursuant to a confidential relationship with Riley.

AJEC has the capability of producing approximately 550 different Riley parts, 90 of which are the most popular. It does not, however, strictly adhere to the specifications in the Riley drawings and makes what it considers to be improvements in at least 25% of the parts. AJEC explains that through its measuring equipment and its Auto CAD (computer aided design) computer design system, it creates new drawings and reverse engineers any parts for which it does not have drawings. In fact, Mr. Beland claims it would take no more than three hours to reverse engineer any Riley part. To the contrary, Riley claims that, without its proprietary information, it is economically infeasible, if not impossible, to manufacture an exact replica of most Riley parts, even by reverse engineering of the original part.

In 1996, after what Riley describes as a dispute concerning AJEC's pricing and apparent overcharges, Riley learned that AJEC's had built up a substantial inventory of Riley parts. Riley claims that AJEC threatened to sell those parts in competition with Riley if Riley did not agree to pay AJEC's prices. In May, 1996, Riley notified AJEC that Riley was revoking AJEC's authority to manufacture and inventory Riley parts and reminded AJEC that the Riley parts it possessed were proprietary and should not be sold to Riley's customers without Riley's consent. The grounds for Riley's claims in this case are that AJEC has continued to hold itself out as a parts manufacturer for Riley and has sold Riley parts directly to Riley's customers.

2.  Specifically, paragraph 14 of the printed Riley purchase order provided:

    *Confidentiality and Buyer's Property:* Any specifications, drawings, manufacturing data and other information transmitted or otherwise provided by Buyer [Riley] to Seller [AJEC] in connection with any quotation or this order are proprietary and confidential, and are the property of Buyer. Seller shall not, at any time, disclose or in any manner reveal such documents or information obtained from Buyer to any third party, nor reproduce, copy or use such documents or information other than in the performance of this order, without the express written consent of Buyer. The obligations contained herein shall survive any cancellation, termination or completion of any order placed pursuant to this purchase order.

3.  Although after April, 1986, the relevant terms and conditions were on the reverse side, prior to that date they were listed in an attachment to which the vender's attention was drawn by a red stamp on the purchase order.

Riley alleges that AJEC's conduct has caused confusion in the market place. Recently, a company in South Carolina, Santee Cooper, made a purchase of Riley parts from AJEC believing that they were Riley-authorized parts. The cartons in which the parts were shipped bore both AJEC product numbers and Riley product numbers. AJEC responds that it did not manufacture the parts involved in that shipment for Riley or anyone else. It contends that the subject parts were ordered from Syheni Castings, Inc. ("Syheni"), which retains the original Riley specification acquired years ago from third parties, but used AJEC's modified design of the Riley part which AJEC bought at the Sjogren auction. AJEC manufactured the particular part for Sjogren prior to its bankruptcy, bought the Riley drawings for the part at the auction and has since modified it to improve performance and durability.[4]

Both parties submitted several affidavits, the most relevant of which was that of John F. Furey ("Furey"), the former manager of Riley's parts department which was submitted by AJEC. Mr. Furey recounts a description of the use of the proprietary drawings that is quite different than Riley's assertions. He explains that he was informed in late April, 1986, that an auction of Sjogren's assets would take place at which an inventory of finished and unfinished Riley parts would be sold along with specialized machinery, including electro-magnetic tapes and CNC printouts. Prior to that auction, Mr. Furey advised Riley to buy the machinery in order to facilitate the effective and efficient manufacture of Riley parts.[5] The president of Riley declined to follow Furey's advice. Mr. Furey, who knew that Sjogren possessed design drawings previously supplied by Riley, is unaware of any efforts on Riley's part to retrieve those drawings.

The business relationship between Riley and AJEC which originated through discussions between Mr. Furey and Mr. Beland in the summer of 1986, was not reduced to writing. A letter dated May 14, 1991, however, confirmed the informal verbal agreement without reference to confidentiality. At that time, although Riley furnished design drawings with each purchase order, Mr. Furey was aware that AJEC had already acquired the machinery from Sjogren which enabled AJEC to make Riley parts.

Mr. Furey claims that he saw detailed design drawings for many Riley parts and equipment at customers' places of business. He understood that some customers obtained such drawings when Riley Stoker Construction employees left with them complete sets of the drawings of Riley equipment, either by accident or as an inducement for the customer to sign off on the final acceptance of the Riley boiler prior to completion of construction.

Furthermore, when obtaining quotations from various vendors to build Riley parts, Mr. Furey states that Riley would send out design drawings without requesting their return whether or not the prospective vendor signed a contract. He is unaware of records of how many or to whom such drawings were sent.

Finally, Mr. Furey explains that at one point Riley made a policy decision not to make demands or threats nor to employ litigation as a means of preventing the manufacture of Riley parts by other companies. It refrained from such enforcement because it believed that to act would damage relationships with its customers whose potential as

---

**4.** In its Lanham Act claim, Riley has alleged that further confusion has arisen out of AJEC's misuse of its trade name. AJEC, however, denies ever having used the Riley's trade name or representing its products to be Riley's. AJEC admits that it hired a former salesman of Riley, Ken Underwood, who had formed a company called Riley Power Company. That company never conducted any business and, after threatened with a lawsuit by Riley, Underwood left AJEC's employ and AJEC bought the stock of Riley Power Company. Although AJEC does not explain its purpose for the acquisition, it states that the company remains dormant. Because there is no proof that the Riley name is actually being used by AJEC and neither party adequately addressed the issue, this Court declines to consider that claim as a basis for injunctive relief.

**5.** Users of such technology can program the machine by manufacturing a part to the desired specifications and then causing the machinery to record the exact processes and movements required for that purpose.

buyers of boiler systems was more valuable than their more certain potential as buyers of replacement parts.

## II. *Prerequisites for a Preliminary Injunction*

In ruling on the motion for a preliminary injunction, this Court must consider whether plaintiff has established that: 1) it has a substantial likelihood of success on the merits, 2) there exists, absent injunctive relief, a significant risk of irreparable harm, 3) the balance of hardships tilts in its favor, and 4) granting the injunction will not negatively affect the public interest. *TEC Engineering Corp. v. Budget Molders Supply Inc.,* 82 F.3d 542, 544 (1st Cir.1996); *EEOC v. Astra USA, Inc.,* 94 F.3d 738, 742 (1st Cir.1996). Those considerations are discussed *seriatim.*

### A. *Likelihood of Success on the merits*

At oral argument, Riley emphasized its contractual claim and downplayed its claim of trade secret misappropriation. This Court will, therefore, consider Riley's likelihood of success on those two claims in that order of preference.

#### 1. *Contractual Claim*

■ Riley argues that the terms and conditions on the reverse of the purchase order created an express agreement restricting disclosure by AJEC upon its acceptance of the offer to contract by performance of the work.[6] *See Northampton Institution for Savings v. Putnam,* 313 Mass. 1, 7, 45 N.E.2d 936 (1943) (performance of an agreement constitutes acceptance); *Gladstone v. Union Warren Savings Bank,* 2 Mass.App. Ct. 850, 312 N.E.2d 579 (1974) (same). Riley points out that nobody at AJEC ever questioned anyone at Riley about the legibility or meaning of the terms and conditions of Riley's purchase order.

AJEC responds that the terms and conditions were practically illegible and were never discussed with AJEC. Furthermore, it never signed the relevant terms and conditions and never signed any confidentiality agreement with Riley despite repeated requests by Riley to do so. There was, therefore, no agreement, express or otherwise, restricting disclosure of the Riley information provided to or acquired by AJEC. AJEC argues, albeit implausibly, that the statement in the top right corner of every purchase order that "This order is not binding until acceptance on acknowledgement copy attached has been returned to individual signing this purchase order" means that no contract is formed until AJEC has countersigned the purchase order which it never did.

Contrary to the defendant's contentions, this Court finds that the terms and conditions, although in small print, are legible and understandable. Furthermore, the statement at the top right corner of the purchase order does not require AJEC's signature to validate the contract. This Court determines that, although it would have been advisable for Riley to obtain a signed contract recognizing the confidentiality of the design drawings, both the drawings themselves and the purchase orders restricted their disclosure. By filling the purchase order, AJEC accepted the contractual conditions through performance and, hence is bound by those terms and conditions. Because AJEC has not complied with all of those terms and conditions, specifically paragraph 14 regarding confidentiality, Riley has demonstrated a substantial likelihood of success on its breach of contract claim.

#### 2. *Trade Secret Misappropriation Claim*

■ To demonstrate misappropriation of trade secrets under Massachusetts law, plaintiff must prove: (1) the information in question is a trade secret, (2) Riley took reasonable steps to preserve the secrecy of that information, and (3) AJEC "used improper means, in breach of a confidential

---

**6.** Paragraph two of the terms and conditions of the purchase orders reads:

Seller's commencement of work on the goods subject to this purchase order or shipment of such goods, whichever occurs first, shall be deemed an effective mode of acceptance of Buyer's offer to purchase contained in this purchase order. Any acceptance of this purchase order is limited to acceptance of the express terms of the offer contained on the face and back hereof. . . .

relationship, to acquire and use the trade secret." *Data General Corp. v. Grumman Systems Support,* 36 F.3d 1147, 1165 (1st Cir.1994); *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.,* 357 Mass. 728, 737–39, 260 N.E.2d 723 (1970). We examine those elements with respect to the facts of the case at bar.

### a. *Drawings are Trade Secrets*

■ Riley's drawings and specifications contain the kind of information generally considered to be a trade secret if secrecy has been maintained. *See USM Corp. v. Marson Fastener Corp.,* 379 Mass. 90, 100, 393 N.E.2d 895 (1979) (recognizing that it "is well settled that detailed manufacturing drawings . . . are prima facia trade secrets").

### b. *Reasonableness of Steps Taken to Preserve Secrecy*

The reasonableness of the steps taken by Riley to preserve the secrecy of its manufacturing drawings is a closer question. The Supreme Judicial Court of Massachusetts has held that

one who claims that he has a trade secret must exercise eternal vigilance. This calls for constant warnings to all persons to whom the trade secret has become known and obtaining from each an agreement, preferably in writing, acknowledging its secrecy and promising to respect it.

*J.T. Healy,* 357 Mass. at 738, 260 N.E.2d 723; *but see USM Corp.,* 379 Mass. at 101, 393 N.E.2d 895 (finding that courts "do not require the possessor of a trade secret to take heroic measures to preserve its secrecy").

■ To determine whether Riley's actions and policies concerning the treatment of the documentation were sufficient to protect its claimed secrecy, the court should consider four factors as suggested by the Supreme Judicial Court:

(1) the existence or absence of an express agreement restricting disclosure;

(2) the nature and extent of security precautions taken by the possessor to prevent acquisition of the information by unauthorized third parties;

(3) the circumstance under which the information was disclosed . . . to the extent they give rise to a reasonable inference that further disclosure, without the consent of the possessor, is prohibited; and

(4) the degree to which the information has been placed in the public domain or rendered "readily ascertainable".

*USM Corp.,* 379 Mass. at 98, 393 N.E.2d 895 (quoting *Kubik, Inc. v. Hull,* 56 Mich.App. 335, 356, 224 N.W.2d 80 (1974)). Furthermore, "a court should consider the relationship and the conduct of the parties" balancing plaintiff's maintenance of its security measures against defendant's improper conduct in obtaining the information. *Id.*

[5] Based upon the parties' written submissions and oral argument, this Court considers that the fourth factor cited in *USM Corp.* (placement in the public domain) is the most problematic. Although its arguments are not uncontested, Riley is likely to meet its burden in proving the first three factors for protecting trade secrets. That is so because 1) there existed an agreement by virtue of the terms of the purchase orders to treat the design drawings as confidential, 2) the security precautions, if followed, were adequate to maintain the requisite secrecy, and 3) considering the continuing business relationship between Riley and AJEC, the circumstances under which the information was provided gave a reasonable inference that further disclosure, without Riley's consent, was prohibited. The plaintiff has failed, however, at this juncture, to meet its burden of proving that its protectable trade secrets are not in the public domain.

Specifically, with regard to this fourth factor, Riley argues that the information it seeks to protect by this motion has never been in the public domain because it has only been distributed to third parties under an obligation of confidentiality and Riley's internal and external security precautions have been consistently observed. Customers have received only general drawings of parts, not design drawings and, to its knowledge, Riley has retrieved all copies of its design drawings from companies that have gone out of business.

According to Riley, information about its parts that is in the public domain must, therefore, consist of data other companies have obtained through reverse engineering. Such data is not the equivalent of the Riley drawings and specifications because the latter permit the construction of an exact replica of the part to be replaced while specifications devised from reverse engineering or general customer drawings are inexact and often cause problems for buyers of such parts. In fact, AJEC, as Riley's representative, often discovered quality and precision problems with unauthorized replacement parts for Riley products. Riley argues that AJEC is able to make better quality parts and has a competitive advantage over other suppliers of Riley parts precisely because AJEC has access to and uses Riley's trade secrets while the other suppliers do not.

AJEC responds that all of the information it uses is in the public domain and that proprietary statements such as the one on Riley's design drawings are largely ignored according to industry standards, citing *Combustion Engineering v. Murray Tube Works*, 222 U.S.P.Q. 239 (E.D.Tenn.1984) (denying trade secret protection to manufacturing drawings in boiler industry because they were found to be in general distribution and the proprietary legend on the drawings did not, without more, automatically protect the drawings as trade secrets). Furthermore, AJEC claims that Riley and its employees have consistently ignored its own official security policies based upon a business decision not to enforce its trade secrets. Design drawings are distributed liberally, and often without confidentiality agreements, to Riley's customers and third parties who, AJEC alleges, redistribute them without restriction, sometimes through publicly advertised auctions.

Riley's formal, written policies for the protection of its trade secrets, if followed, are sufficient. It appears, however, according to Mr. Furey, whose objectivity has not been challenged, that there was an unwritten, informal policy which overrode the formal policy. Consequently, design drawings were distributed haphazardly to both customers and parts suppliers for years. That being the case, the relatively weak proprietary statement on the Riley drawings does not preserve the trade secrecy of the information in the drawings.

Furthermore, notwithstanding the confidentiality agreements it did obtain, Riley's own expectations of maintaining its trade secrets were time limited. In the one confidentiality agreement that has been introduced into these proceedings, Sjogren contracted with Riley to keep its parts specifications confidential for ten years after the expiration of the contract in 1985. This Court finds that, for the purpose of its motion for a preliminary injunction, Riley has not proved that it exercised "eternal vigilance" over its trade secrets even if its written policies suggest an acceptable, "non-heroic" vigilance. *See J.T. Healy*, 357 Mass. at 738, 260 N.E.2d 723; *USM Corp.*, 379 Mass. at 101, 393 N.E.2d 895. The Court, therefore, concludes that Riley has not met its burden of proving that it took reasonable steps to preserve the secrecy of its trade secrets.

### c. Breach of Confidential Relationship

Riley argues that the relationship between a manufacturer and an independent contractor has consistently been held to establish a confidential relationship. *See Burten v. Milton Bradley Co.*, 592 F.Supp. 1021, 1030–1031 (D.R.I.1984) *reversed on other grounds* 763 F.2d 461 (1st Cir.1985); *Institutional Management Corp. v. Translation Systems, Inc.*, 456 F.Supp. 661, 670 (1978). AJEC again denies that it ever entered into any relationship with Riley to maintain the confidentiality of Riley's products and, in fact, expressly declined to agree to such a relationship. This Court finds that there was a confidential relationship between Riley and AJEC expressly manifested by AJEC's acceptance of the purchase orders and implied by the manufacturer/independent contractor relationship between the parties. Because this Court has, however, previously found that Riley has not met its burden of proving that it took reasonable steps to preserve the secrecy of the specifications and drawings of its products, the Court declines to address the third element of trade secret misappropriation.

### B. *Irreparable Harm*

Because likelihood of success on the merits of the claim for trade secret misappropriation has not been shown, irreparable harm is not presumed. *See Picker Intern. Corp. v. Imaging Equip. Services, Inc.,* 931 F.Supp. 18, 44 (D.Mass.1995) ("misuse of trade secrets is generally deemed to involve irreparable harm"). Riley has, however, shown a likelihood of success on its breach of contract claim. This Court concludes, nevertheless, that any harm caused by such a breach can be recompensed by monetary damages.

Riley offers several reasons why it will suffer irreparable harm if injunctive relief is not granted. It contends that it has a worldwide reputation for expertise in manufacturing and supplying replacement parts for its boiler systems and, consequently, has a strong interest in insuring that its systems are properly maintained. Because Riley no longer controls the quality and precision of the Riley parts manufactured by AJEC, that reputation will allegedly suffer by the dissemination of poorly built or unwarranted parts to Riley's customers. *See Flag Fables, Inc. v. Jean Ann's Country Flags and Crafts,* 730 F.Supp. 1165, 1174 (D.Mass.1989) (finding in a copyright case that the "potential damage to the plaintiff's reputation for excellence is just the kind of irreparable harm which a motion for preliminary injunction is intended to address"); *cf. Hypertherm, Inc. v. Precision Products, Inc.,* 832 F.2d 697, 700 (1st Cir.1987) (finding no irreparable harm in a trademark case in which the imitators marketed and sold their products as imitations).

Riley also suggests there is a likelihood of confusion amongst customers who buy AJEC parts because AJEC was formerly an independent contractor for Riley and those customers may believe they are actually buying authentic Riley parts. Where there is confusion, Riley argues, irreparable harm is likely because future sales will inevitably be lost by it. *See R.J. Toomey Co. v. Toomey,* 683

F.Supp. 873, 879 (D.Mass.1988) (discussing a Lanham Act violation).[7]

Although Riley makes a valiant effort to convince this Court that it will suffer irreparable harm in the absence of injunctive relieve, it has offered little or no evidence of actual confusion by consumers or of the manufacture by AJEC of poor quality Riley parts. It produced evidence that 1) Santee Cooper received cartons on which parts numbers of both Riley and AJEC were stamped possibly causing some confusion with that customer and 2) parts suppliers, other than AJEC, produced parts of a lower quality. Such evidence is insufficient to establish irreparable harm in the context of a motion for preliminary injunction. Moreover, it seems that Riley is perfectly capable of clarifying any potential confusion by informing its customers that AJEC is no longer affiliated with Riley's products in any way.

While Riley's arguments are inadequate to show current irreparable harm, they suggest the possibility of irreparable harm *if* certain events transpire in the future, namely:

1) because AJEC is no longer in communication with Riley regarding the quality of its parts, it is possible that the quality of AJEC's parts will deteriorate, and

2) if AJEC holds, or plans in the future to hold, itself out as an authorized dealer of authentic Riley parts, consumer confusion will occur.

Irreparable harm is not, however, demonstrated, for the purpose of satisfying one of the prerequisites for injunctive relief, by what an adversary might possibly do in the future to violate the movant's rights. Because Riley has not met its burden of proving that the alleged harm has occurred or is likely to occur in the future, imposition of an injunction at this time would be improper and this Court, therefore, declines to do so.

### C. *Balance of Hardships and Public Interest*

Because neither party offered evidence or argued with particularity about the balance of hardships (apart from irreparable harm)

---

7. Riley asserts, as a third, indirect element of harm, that AJEC will acquire a permanent advantage over its competitors, including Riley, by piggy-backing on Riley's product development information.

or the public interest, this Court finds that those factors were not at issue and cannot lend support to the entry of an injunction.

### III. *Conclusion*

Because Riley has failed to satisfy the prerequisites for a preliminary injunction with respect to either its breach of contract claim or its claim for misappropriation of trade secrets, its motion for a preliminary injunction will be denied.

### ORDER

For the reasons set forth in the Memorandum, the motion of the plaintiff, DB Riley, Inc., for a preliminary injunction is DENIED.

So Ordered.