## BAYSTATE TECHNOLOGIES, INC., Plaintiff,

v.

## BENTLEY SYSTEMS, INC., Defendant.

### Civil Action No. 96–40196–NMG.

United States District Court,
D. Massachusetts.

Dec. 6, 1996.

---

Louis M. Ciavarra, Anthony D. Pellegrini, Bowditch & Dewey, Worcester, MA, for Baystate Technologies, Inc.

Timothy C. Blank, Elaine Wallace, Dechert, Price & Rhoads, Boston, MA, for Bentley Systems, Inc.

## MEMORANDUM OF DECISION

GORTON, District Judge.

Plaintiff, Baystate Technologies, Inc. ("Baystate"), filed a six count complaint against Bentley Systems, Inc. ("Bentley") alleging (1) misappropriation of trade secrets in violation of M.G.L. c. 42, (2) copyright infringement in violation of 17 U.S.C. § 106, (3) violations of the Lanham Act, 15 U.S.C. § 1125(a), (4) conversion, (5) tortious interference with advantageous business relations, and (6) unfair and deceptive trade practices in violation of M.G.L. c. 93A §§ 2, 11. After hearing and evaluating the evidence proffered by the parties during a three-day bench trial, this Court finds for the Defendant on all counts.

*I. Procedural History:*

On September 20, 1996, Baystate moved, pursuant to Fed.R.Civ.P. 65, for a preliminary injunction

1) to enjoin Bentley from selling, distributing, advertising for sale, or publicizing in any way a CADKEY–to–Microstation translator product;

2) to order Bentley to retrieve all copies or versions of the CADKEY source code and either return them or hold them in escrow; and

3) to enjoin Bentley from using any information or knowledge it obtained as a result of having the CADKEY source code.

A hearing was held on October 11, 1996, at which the parties agreed to an expedited trial schedule to address all issues of liability and equitable relief but not the issue of damages. The bi-furcated trial was heard without jury from October 22 through October 28, 1996.

## II. *Findings of Fact*

Plaintiff, Baystate, is a Massachusetts corporation with a principal place of business in Marborough, Massachusetts. Defendant, Bentley, is a Pennsylvania corporation with a principal place of business in Philadelphia, Pennsylvania. Both Baystate and Bentley are, at least in part, manufacturers of mechanical computer aided design ("CAD") products. In general, CAD software products enable architects, engineers and other design professionals to design and alter designs of buildings, mechanical devices and electronic equipment using computers as drafting devices. They can then produce blue prints and other design drawings through their computers.

Baystate acquired its CAD software, called CADKEY, along with the CADKEY copyrights and trade secrets, from Cadkey, Inc., a Connecticut software company, in June, 1996. Baystate also produces a software program that works with CADKEY known as DRAFT–PAK. Bentley manufactures the CAD product Microstation. CADKEY and Microstation are computer programs which perform similar functions and thus are competitive products.

The issues made in this case relate to a data translator which is currently being developed for Bentley. It will, if successful, translate between the CADKEY system and the Microstation system. In general, data translators are common in the CAD market because users of CAD products commonly employ more than one CAD system to perform their necessary tasks and, as a result, often transfer information between various CAD systems. This need has created a demand for translators of all kinds in the CAD market and many companies, including Bentley and, to a limited extent, Baystate, manufacture data translators, often by what is known as "reverse engineering."

### A. *Cadkey*

Cadkey, Inc. ("Cadkey") was founded by Livingston Davies in the early 1980's. Livingston Davies was employed as president of Cadkey until late 1992 when he hired Malcolm Davies (no relation) to replace him as president and George Krucik to be vice-president. Livingston Davies remained an employee during the transition and until about late 1993. He was at all material times and remains today Chairman of the Board of Directors of Cadkey.[1]

### B. *Infotech*

Infotech Enterprises, Ltd. ("Infotech"), located in Hyderabad, India, was founded in 1992 by Mohan Reddy, who has been its Managing Director since that time. Today, it has over 270 employees in India and is engaged in the business of providing software services and products as well as third-party software development. By early 1994, Infotech had developed a software product called Management of Drawings and Engineering Systems ("MODES").

### C. *Chronology of Events, 1994*

In early 1994, Infotech sought to enhance MODES so that it would have the ability to "read" CADKEY data files. Mr. Reddy, who had previously met Livingston Davies in India, approached him at a trade show in Annapolis, Maryland, in or about late March of that year. Mr. Reddy told Livingston Davies about Infotech's purpose and requested any materials Mr. Davies could provide to assist in the project.

At that time, Livingston Davies was no longer president of or employed by Cadkey but was president of a company called Cutting Edge Technologies, which marketed CAM products developed by Cadkey. He agreed to help Mr. Reddy and, on April 27, 1994, transmitted by electronic mail ("e-mail") a copy of what he thought was Version 5.0 of the CADKEY Part File Tool Kit. Al-

---

**1.** After Baystate's acquisition of the CADKEY system in June, 1996, however, the company changed its name to Micro Control Systems, Inc. ("MCS").

though the e-mail message that accompanied the program material contained no mention of confidentiality or copyright protection, the Part File Tool Kit itself was labeled "confidential—company material."

A Part File Tool Kit typically consists of definitions or header files, a library of executable files, and a document that describes the organization of the file data structure and descriptions of the access functions that are included in the library of executable files. Specifically, in this case, the CADKEY Part File Tool Kit ("the Tool Kit") is a subset of the CADKEY code which allows a user or third party developer to read and write the data files into a non–CADKEY program using the information in the Tool Kit. There are two components to the CADKEY Tool Kit: 1) source code, which comes on a floppy disk, and 2) documentation, which explains the CADKEY data structures and how the CADKEY file format is organized. Baystate has a registered copyright in each component.

Mr. Reddy received Livingston Davies' e-mail of April 27, 1994 (Exhs. 40 and 41) and forwarded it to his employees who soon discovered that the Tool Kit was not version 5.0, but actually an earlier, superseded version 4.0. Version 4.0 was not helpful to Infotech and thus was not used.

On June 2, 1994 and again on June 9, 1994, Mr. Reddy wrote directly to Osman Rashid at Cadkey explaining that the materials he had received from Livingston Davies were of no use and requesting additional information. Mr. Reddy received no response from Mr. Rashid, but on June 14, 1994, Livingston Davies sent an e-mail to George Krucik at Cadkey and requested that Mr. Krucik provide Mr. Reddy with the updated material. Again Mr. Reddy received no response from Cadkey. A week or so later, however, Livingston Davies met Mr. Reddy at a CAD industry trade show in the United States and provided Mr. Reddy with a copy of the Tool Kit documentation for version 5.0 (Exh. 44).[2]

The Tool Kit documentation delivered to Mr. Reddy, unlike other copies of that documentation in evidence, bore no cover sheet containing copyright notice to users, but it was stamped "confidential" on all pages. Mr. Reddy and Infotech therefore had notice of the confidential nature of the documentation even if originally Exh. 44 included no copyright notice. Mr. Reddy was also aware of the probability that the documentation was copyrighted because the version 4.0 included a copyright notice.

No express written or oral agreement existed between Mr. Reddy and Livingston Davies regarding the use of the documentation delivered in June, 1994. Mr. Reddy admitted however, that if he had received source code from any company, he would have understood that such material was confidential and was not to be used on a competitor's product. In this particular case, however, Mr. Reddy did not treat the Tool Kit documentation as confidential because it did not contain source code.

Sometime prior to the summer of 1994, George Krucik, vice-president of Cadkey, changed Cadkey's policy with respect to the dissemination of its Tool Kit documentation and made it distributable, without restriction, to any third party developer who requested it. The evidence was not clear, however, as to how or if that policy was implemented or whether it was intended to apply to the whole Tool Kit or just to the Tool Kit documentation.

After Mr. Reddy returned to India with the Tool Kit documentation, Infotech used it as a reference to develop the "read" capability of CADKEY files into MODES. By September 1, 1994, Infotech had completed the development of that CADKEY "read" capability.

---

**2.** Although Livingston Davies testified that he provided Mr. Reddy with a "hard copy" of the same information he provided in April, 1994 along with some "user notes" about CADKEY, Mr. Reddy testified (and Exh. 44 indicates) that all he received at that meeting was the Tool Kit documentation. In fact, Mr. Reddy was sure he received no source code with the documentation of either version 4.0 or version 5.0, even though it is clear from the exhibits that the former included demonstration programs and the latter did not (Exhs. 41, 44). In any event, the version 4.0 documentation was not used by Infotech.

### D. The Contract between Cadkey and Infotech

In November, 1994, Cadkey entered into a contract with Infotech whereby Infotech was retained to assist Cadkey in the development of its CAD software products. That contract gave Infotech access to Cadkey's trade secrets and copyrighted material, including CADKEY proprietary information and confidential source code. Cadkey required Infotech to sign a non-disclosure agreement with respect to confidential information disclosed from the date of the contract through January, 1998. By its terms, that agreement did not apply to confidential information already in the possession of or developed independently by Infotech (Exh. 5).

Infotech continued to work on its CADKEY project until early September, 1996. Although that work proceeded until after Baystate acquired the CADKEY line, no written agreement between Baystate and Infotech was ever executed. In early September, 1996, Baystate terminated its relationship with Infotech for reasons discussed below and has withheld payment for services rendered prior to that termination.

### E. Bentley

Peter Brooks began his employment at Bentley in 1994. His responsibilities included development and marketing of Bentley's Microstation product in the mechanical CAD market. As such, Mr. Brooks became interested in developing a CADKEY–to–Microstation translator ("the Translator"). In late 1995, Mr. Brooks contacted Baystate to inquire about their interest, if any, in developing such a translator and/or entering into a partnership to acquire the CADKEY product line. Initially, Robert Bean, president of Baystate, expressed some interest but, after discovering the confidentiality agreement between Baystate and Cadkey which restricted Baystate's use of the CADKEY Tool Kit, someone at Baystate informed Mr. Brooks that Baystate could not develop the Translator without Cadkey's permission.

In late 1995 or early 1996, Mr. Brooks approached Livingston Davies, who had resumed his position as president of Cadkey, and offered Cadkey $100,000 for permission to use the CADKEY Tool Kit to develop the Translator. Livingston Davies responded that, although under certain circumstances he would be willing to grant such permission, the offer was inadequate and was thus declined.

### F. Bentley's relationship with Infotech

In or about March, 1996, Mr. Reddy introduced himself to Mr. Brooks at a trade show in Cambridge, Massachusetts. Mr. Reddy described Infotech and its experience in the CAD industry and solicited software development work from Bentley. Mr. Brooks was non-committal at the time, but in June, 1996, decided to consider Infotech as a possible developer of the Translator. At trial, Mr. Brooks testified credibly that the business reasons for his decision to hire Infotech included:

1) Infotech's expertise in CAD products and reverse engineering,

2) Infotech's good reputation,

3) Bentley's desire to reduce costs by outsourcing the work,

4) his personal interest in managing an offshore development project, and

5) His belief that the Translator would be an appropriate starting point for a business relationship between Bentley and Infotech.

On June 7, 1996, Mr. Brooks sent an e-mail to Infotech requesting a proposal for the development of the Translator. He was aware at that time that Infotech did development work for Cadkey and assumed that Infotech had access to proprietary information belonging to Cadkey. He informed Infotech that it could not use any proprietary, third-party information and that no programmers who worked on any Cadkey development could work on the Translator project. Infotech agreed to Bentley's conditions and, on or about July 17, 1996, signed a letter agreement which incorporated those conditions and indemnified Bentley against any violation thereof. Infotech began work on the Translator at about that time. Mr. Reddy testified credibly that Infotech has not misused CADKEY proprietary information at any time.

Mr. Reddy also testified that Infotech did not employ programmers on the Translator who had performed substantive work on the CADKEY project, i.e. that a so-called "Chinese Wall," existed between the two projects. Notwithstanding that claim, a "Dr. Rao" supervised both projects and a "Subba Rao" worked as a computer programmer for the Bentley Translator project and apparently did some minimal work on the CADKEY project. Although this Court finds that there was no impropriety on the part of Infotech, it also finds that the CADKEY project and the Bentley Translator project were not kept completely separate.

### G. Baystate

Baystate began its business relationship with Cadkey in June, 1993. At that time Baystate entered into a confidential agreement with Cadkey wherein Baystate was afforded access to proprietary information and trade secrets of Cadkey in connection with the development of DRAFT–PAK and its use with CADKEY. In late 1995, Baystate began negotiations with Cadkey to purchase the CADKEY product line. That purchase was consummated in June, 1996, and, as a result, Baystate obtained all of the trade secrets and copyrights associated with the CADKEY product line previously owned by Cadkey. Baystate also assumed the rights and obligations of Cadkey with respect to the CADKEY development project undertaken by Infotech.

### H. The Errant E–mail

On August 21, 1996, Infotech sent an e-mail transmission to Bentley and mistakenly copied it to Baystate. That e-mail contained portions of the source code for the Translator. Baystate analyzed the unsolicited transmission and came to the conclusion that source code from the CADKEY "header files," including the data structures contained within those files, had been copied by Infotech into the Translator project. Prior to a complete analysis of the e-mail, Baystate representatives discussed their allegations with Mr. Reddy of Infotech and were assured by him that no CADKEY proprietary informa-

tion had been used in developing the Translator.

Infotech apologized to both Bentley and Baystate for the errant e-mail and, in an effort to maintain its business relationship with Baystate, offered to terminate the Translator project with Bentley. Infotech explained that the Translator was only about 20% complete. Baystate refused Infotech's offer to continue business relations and demanded that Infotech return to it all CADKEY proprietary information. Infotech complied with the demand. Baystate then offered to forgo any legal action against Infotech in exchange for a waiver of its obligation to pay for prior services (then amounting to about $70,000 U.S.) (Exh. 31). Infotech declined Baystate's offer.

In September, 1996, Bentley began an advertising campaign which included, as one component, a promise of the future availability of a CADKEY–to–Microstation Translator. That campaign was scheduled to continue until December 31, 1996 and did not mention when the Translator would become available. Baystate inferred from such advertisements that the development of the Translator was much closer to completion than anticipated, and, upon further analysis of the errant e-mail, concluded that its rights had been violated. Soon thereafter, Baystate filed this civil action.

### J. Experts General Findings

Both parties offered the testimony of expert witnesses. The experts agreed that the data structures at issue were, at least to some extent, similar, although defendant's expert opined that such similarity was necessary. Other than the similarity in the data structures, neither expert testified with respect to any similarity between the object code or the source code of the CADKEY program and the proposed Bentley Translator program.

### III. Conclusions of Law

For the purpose of its complaint, Baystate claims proprietary interests in three different products: the CADKEY source code, the Part File Tool Kit source code and the Part File Tool Kit documentation. Baystate's le-

gal interests in those products with respect to each claim will be addressed *seriatim.*

### A. *Copyright Claim*

A computer program such as CADKEY is protectable under the Copyright Laws. 17 U.S.C. § 101; *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1247 (3rd Cir.1983), *cert. dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984). For copyright purposes, a "computer program" is defined as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101 Accordingly, the computer program comprising CADKEY is copyright protected (if the appropriate procedures are followed) but because the data structures at issue in this case do not bring about any result on their own, they are copyright protected, if at all, only as a part of the whole computer program.

The owner of a copyright has the exclusive right to copy, make derivative works and distribute the copyrighted material. 17 U.S.C. § 106. If anyone violates any of those exclusive rights, he "is an infringer of the copyright." 17 U.S.C. § 501(a). To prove its claim of copyright infringement, a plaintiff must show that: (1) it owns a valid copyright in the disputed item and (2) the alleged infringer copied the protected work. *Concrete Machinery Co. v. Classic Lawn Ornaments,* 843 F.2d 600, 605 (1st Cir.1988). In the case of computer programs, the alleged infringer must be shown to have copied "constituent, original elements" of the program. *Data General Corp. v. Grumman Systems Support,* 36 F.3d 1147, 1160, n. 19 (1st Cir.1994) ("*Grumman II* ").

### 1. *Validity of Baystate's Copyright*

■ With regard to the first element of proof, the copyright in a work "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). The ownership of a copyright may be transferred "by any means of conveyance or by operation of law." 17 U.S.C. § 201(d). Further, a certificate of registration constitutes *prima facie* evidence of the validity of the copyright and the facts stated in the certificate. 17 U.S.C. § 410(c). Thus, because Baystate has entered into evidence copyright registrations for the CADKEY program, the Part File Tool Kit and the Part File Tool Kit documentation (Exhs. 1 and 57), there exists a rebuttable presumption of validity and ownership of those copyrights by Baystate. The burden, therefore, shifts to Bentley to prove plaintiff does not own a valid copyright in the CADKEY programs and documentation. This Court concludes that defendant has not met that burden.[3] Therefore, plaintiff has proven it owns a valid copyright in its CADKEY computer program source code in existence in 1994, the Part File Tool Kit source code and the Part File Tool Kit documentation.

### 2. *Copying of the Work*

With regard to the second element of proof of a copyright claim, a party must first prove copying by the alleged infringer either through direct evidence or through circumstantial evidence. *Lotus Development Corp. v. Borland International, Inc.,* 49 F.3d 807, 813 (1st Cir.1995), *aff'd* —— U.S. ——, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996). Because it is often difficult to prove copying directly, most parties offer circumstantial evidence of copying by showing that the defendant had access to the copyright-protected work and that there is a probative similarity between the protected work and the alleged infringing work, i.e. the two works must be similar enough for the finder of fact to infer factual copying. *Id.* If factual copying is shown, the plaintiff must then prove the copying was extensive enough to render the two works substantially similar. *Id.*

### a. *Factual Copying*
#### i. *Access*

At the time of the alleged copying, Infotech had access to the CADKEY source code,

---

**3.** Defendant argues that because plaintiff did not have a written work-made-for-hire agreement with Infotech, certain aspects of the current CADKEY version are owned by Infotech. This defense is irrelevant to the discussion at hand in that the CADKEY version at issue was that which was in existence when the CADKEY "read" capability was added to MODES, i.e. before September, 1994. This Court declines to address the issue of copyrights related to parts of the program worked on by Infotech.

the Part File Tool Kit Source Code and the Part File Tool Kit documentation, as a result of either its confidential relationship with Cadkey that began in November, 1994 or its access to documentation received from Livingston Davies in June, 1994. The plaintiff has, therefore, shown access. This Court has already found that the "Chinese Wall" at Infotech allegedly built to separate the CADKEY project from the Bentley Translator project crumbled to the point of being incapable of rebutting a finding of access.

### ii. *Probative Similarity*

■ This Court concludes that there exists a probative similarity between the names and organization of the data structures of the Part File Tool Kit source code and documentation, on the one hand, and the Translator as transmitted in the e-mail of August 21, 1996, on the other hand. Furthermore, Infotech has admitted that 1) it "referred" to the Tool Kit documentation when producing the CADKEY "read" capability for MODES and 2) that portion of MODES was used in developing part of the Translator. There was, however, no evidence of probative similarity between any other aspect of the two computer programs. Hence, plaintiff has shown probative similarity only with respect to the names of the so-called data structures as that term is used by the parties in Exhs. 23, 26, 53, and 54, and the organization of the files within the data structures.[4]

### b. *Substantial Similarity of the Computer Program*

Having found factual copying, this Court turns to a consideration of substantial similarity. If the data structures are copyright protected *and* are constituent elements of the CADKEY computer program, then plaintiff has proven copyright infringement by Infotech.[5] The Court concludes, however, that the plaintiff lacks proof of either element, i.e. the data structures at issue are not

protected under the copyright laws, nor (even if they were so protected) are they constituent, original elements of the program. *See infra.*

In this case the copied components are the data structure names and the organization of the files within the data structures. To determine the legal consequences of such copying, this Court must consider:

1) whether the copied components are protected parts of a copyrighted work under the copyright laws; and

2) whether Infotech's use of the data structures amounts to the copying of constituent elements of a copyrighted work.

In deciding the issue, this Court adopts and applies the "abstraction-filtration-comparison" test applied in *Gates Rubber Co. v. Bando Chemical Industries, Ltd.,* 9 F.3d 823 (10th Cir.1993) and acknowledged in *dicta* by the First Circuit Court of Appeals in *Lotus,* 49 F.3d at 814.

### i. *The Data Structures Are Not Copyright Protected*

■ Liability for copyright infringement is incurred only when *protected elements* of a copyrighted work are copied. *Gates Rubber,* 9 F.3d at 833 (citing *Baker v. Selden,* 101 U.S. 99, 101–03, 25 L.Ed. 841 (1879)); *Lotus,* 49 F.3d at 815. A fundamental principle of copyright law is that "protection extends only to the author's original and creative expression and not to the ideas embodied in that expression." *Gates Rubber,* 9 F.3d at 836; *Lotus,* 49 F.3d at 815. The Copyright Act codifies that principle by denying protection to "any idea, procedure, process, system, method of operation, concept, principle, or discovery...." 17 U.S.C. § 102(b); *Id.* Courts give effect to those copyright principles by drawing on two established copyright doctrines: the doctrine of merger and the doctrine of *scenes a faire. Gates Rubber,* 9

---

4. Additionally when referring to the names of the data structures, this Court intends to include both the names of the data structures and the names of the files in the data structures.

5. In order to prove liability on the part of Bentley, plaintiff must also prove that a relationship between Bentley and Infotech existed which im-

putes to Bentley legal responsibility for actions taken by Infotech in developing the Translator. Although there is credible evidence that such a relationship existed, this Court declines to address that issue because it finds in favor of the defendant on separate grounds as discussed *infra.*

F.3d at 838; *Harbor Software, Inc. v. Applied Systems, Inc.,* 925 F.Supp. 1042, 1048 (S.D.N.Y.1996).

Part of the copying that took place in this case relates to data structure names or, more specifically, the words and abbreviations used to describe the files contained within the data structures and the data structures themselves. The evidence demonstrated that some of the words and abbreviations or names used in the defendant's program, although not identical in the layman's sense, were very similar to those of the plaintiff's copyrighted program.[6]

Although Baystate's expert, Professor Craig Wills, testified that the CADKEY data structure names were independently created and were original expression, this Court concludes that his opinion is not decisive of the issue of whether they are copyright protected. In *Lotus,* the First Circuit held that the words used in Lotus 1–2–3's menu command hierarchy were not protectable because they were the means by which functions were performed and thus, constituted a "method of operation" excluded from copyright protection. In so holding, the First Circuit Court of Appeals concluded that even though the authors of Lotus 1–2–3

> made some expressive choices in choosing and arranging the Lotus command terms, we nonetheless hold that the expression is not copyrightable.... [T]he 'expressive' choices of what to name the command terms and how to arrange them do not magically change the uncopyrightable menu command hierarchy into copyrightable subject matter.

*Lotus,* 49 F.3d at 816.

Under the merger doctrine, protection is denied to expression that is inseparable from the ideas, processes or facts underlying the expression. *Gates Rubber,* 9 F.3d at 837. When there are only a few means of expressing an idea, process or fact, copyright protection is, therefore, denied to those means of expression. *Id.* Mohan Reddy testified that the name of a file is typically related to its function. A file that controls or creates color

has a name in which some form of the word "color" appears. In that case, the name of a file, "color", merges with the idea or function of the file, "to create a color", and is not protected by copyright laws.

With respect to copyright protection afforded to the organization of the data structures, a second doctrine applies. Under the *scenes a faire* doctrine, protection is denied to those elements of a program that have been dictated by external factors. *Gates Rubber,* 9 F.3d at 838. For computer programs, those external factors include, among other things, compatibility requirements and industry-wide programming practices. *Id.*

In this case, the court concludes that the selection and organization of the elements in the data files is dictated mainly by external factors. The product being developed is a data translator that is designed to "read" the data files of CADKEY. The process of "reading" the CADKEY data files requires that the elements contained within the data structures of the Translator be organized in the same manner as the elements in the data structures of CADKEY. Without such compatibility, the Translator would not function because it would "misread" the CADKEY data files.

Additionally, the organization of names is, at least partly, a function of efficiency. Walter Anderson, defendant's expert witness, testified that the names and the arrangement of those names serve a functional and necessary purpose in the code of a data translator. They permit a computer programmer who produces a data translator to refer back to the documentation of the "target product" (the program the data translator seeks to read) as he creates the code for the translator.

Significant differences between the names and organization of the names used in the "target product" and the translator would be inefficient for the programmer. For that reason, the data structure names in Infotech's MODES product had to be similar to the data structures in the Part File Tool Kit

---

**6.** Plaintiff's expert created a chalk comparison of the words and abbreviations used in the "Fldimnot" file of the CADKEY source code and the

"tagPRTDDimNote" file in the Translator. *See also* Exh. 54 (similar table prepared by defendant's expert).

documentation because the computer programmer needed to refer to the documentation in the process of creating and manipulating the CADKEY "read" capability of MODES. Furthermore, the Part File Tool Kit documentation stresses the necessity of following the CADKEY structures closely:

> It is up to the programmer to comply with the CADKEY entity structures and to codify and enforce an internal structure for any user defined entities or else chaos will ensue!

Exh. 44, p. 3.

With regard to industry-wide standards, Scott Taylor, an apparently objective and neutral witness, shed at least some light. Mr. Taylor developed many translators, including one which could read CADKEY. It was his practice to use, at least to some extent, both the target product's data structure names and its organization of the data structures. Hence, when he created a data translator which could "read" CADKEY files, he used the CADKEY file names and the organization of data structures as they were described in the Part File Tool Kit documentation. Walter Anderson testified that he used the same method in creating a translator to read AutoCAD files. On the basis of relatively limited evidence of the CAD industry standards, and after applying all of the relevant copyright principles, this Court concludes, therefore, that the data structure names and the organization of those names are not protected expression under the copyright laws.

ii. *Application of Abstraction–Filtration–Comparison Test*

■ Even if the data structures at issue were protected under the copyright laws, those parts of the computer program constitute neither a substantial portion nor a significant aspect of the whole copyrighted work. *See Gates Rubber*, 9 F.3d at 838–39. In this case the copyrighted work is the CADKEY program as manifested through the CADKEY source code, the Part File Tool Kit Source Code and the Part File Tool Kit documentation. The burden was on Baystate to demonstrate the significance of the copied data structures, and, in this Court's opinion, Baystate did not meet that burden.

The abstraction-filtration-comparison test consists of three prongs whereby the Court is directed:

1) to divide the computer program at issue into its structural parts according to varying levels of generality or abstraction;

2) to examine each of those structural parts and filter out those which are not copyright protectable; and

3) to compare the remaining protectable parts of the plaintiff's program to the defendant's work to determine whether the defendant has misappropriated substantial elements thereof.

*Id.* at 834; *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 706 (2nd Cir.1992). During the trial, there was virtually no evidence (and only minimal argument) that anything other than the data structures were copied in this case. This Court therefore considers only the copied data structures when applying the abstraction-filtration-comparison test.

First, as taught by the *Gates Rubber* decision, a computer program

> can often be parsed into at least six levels of generally declining abstraction: (i) the main purpose, (ii) the program structure, (iii) modules, (iv) algorithms and data structures, (v) source code, and (vi) object code.

*Gates Rubber*, 9 F.3d at 835. In applying copyright principles to the different levels of a computer program, the main purpose of the program will almost always be an unprotectable idea, as will be the basic purpose of each module of the program. At the other end of the spectrum, source and object code will almost always be found to be protectable expression. However, the intermediate levels of abstraction are less prone to generalizations. *Id.* The data structures at issue in this case fall within an intermediate level.

Second, this Court has already decided, *supra*, that the data structures are not protected elements. For purposes of applying the abstraction-filtration-comparison test, however, this Court will assume *arguendo*

that the data structures are protected. By virtue of that assumption, this Court is impelled to consider the third and final prong of the test.

The expert testimony showed that, although data structures are generally a necessary component of a computer program for organizational and efficiency purposes, the original naming of data structures takes very little of the total time or creative genius necessary to develop a program. Furthermore, data structures are not, by themselves, executable, i.e. a computer cannot read data structures and perform any function. Although the importance of a program component is not strictly a function of quantity, the evidence in this case demonstrates that the subject data structures represent only a small portion of the total CADKEY program.

As stated previously, if the CADKEY data structures are copyright protectable, they are so only as part of the computer program in which they are embedded. Baystate has failed to prove, by a preponderance of the evidence, that the relative significance of these data structures are substantial to the overall program and its operation. This Court concludes, therefore, that the defendant's work is not substantially similar to plaintiff's work and hence the defendant has not infringed plaintiff's copyright.

c. *Substantial Similarity of the Documentation*

 One more Copyright issue needs to be addressed: whether Baystate's copyright in the Part File Tool Kit documentation was infringed. Because the documentation is not a computer program as such, this Court does not necessarily examine it as it did the CADKEY computer program, *supra*.

The documentation contained the data structures which were the subject of the experts' comparisons. Infotech admitted that its programmers referred to the Part File Tool Kit documentation before and during their creation of the CADKEY "read" capability component of MODES. Although Mr. Reddy of Infotech acknowledged that such documentation was confidential and he had reason to know of its copyright, he denied that Infotech's use of the documentation

as a reference violated any confidence or copyright. Also, although Infotech admitted referring to the documentation, the minimal evidence of copying that was offered by plaintiff was unpersuasive.

It is clear that part of the Translator source code contained in the August 21 e-mail is similar to parts of the written Part File Tool Kit documentation. That documentation is not, however, at all similar to the Translator in an overall comparison of content, purpose or use. With respect to the documentation itself, therefore, this Court concludes that there does not exist the substantial similarity between it and the Translator necessary to prove copying by Infotech.

The Supreme Court's holding in *Baker v. Selden,* 101 U.S. 99, 25 L.Ed. 841 (1879) is also instructive. In that case, the Supreme Court held that Selden's copyright in a book, in which he explained his new system of book-keeping, did not grant him an exclusive right to the use of that system. *Baker,* 101 U.S. at 106, cited with approval in *Lotus,* 49 F.3d at 813–14. Here, Baystate's copyright of the Part File Tool Kit documentation does not grant it an exclusive right to use the information conveyed in that documentation and thus, Infotech's use thereof does not infringe that copyright.

3. *Summary Of Copyright Claim*

This Court concludes that the plaintiff has not met its burden of proving 1) that the data structures are copyright-protected, 2) that the data structures (even if copyright protectable) are constituent and essential elements of the CADKEY computer program, and 3) that there exists a substantial similarity between the Part File Tool Kit documentation and the Bentley Translator.

B. *Trade Secret Misappropriation Claim*

 Trade Secret protection is afforded to computer software as long as the matter sought to be protected is not generally known in the industry. Trade secrets are, however, protected only against misappropriation through deceptive or fraudulent means, i.e. not including discovery by innocent

means, such as reverse engineering. M.G.L. c. 93, § 42.

To demonstrate misappropriation of trade secrets under Massachusetts law, Baystate must prove: (1) the information in question is a trade secret, (2) Baystate took reasonable steps to preserve the secrecy of that information, and (3) Bentley "used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Grumman II*, 36 F.3d at 1165; *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 737–39, 260 N.E.2d 723 (1970).

■ The case at bar includes a twist on the typical misappropriation of a trade secret case in that a third party, not the defendant, was entrusted with the trade secret at issue. Even so, if Bentley *knowingly* benefitted from a trade secret which Infotech obtained by way of its confidential relationship with Baystate, Bentley is liable to Baystate for any misappropriation thereof. *Data General Corp. v. Grumman Systems Support Corp.*, 795 F.Supp. 501, 507 (D.Mass.1992), *aff'd* 36 F.3d 1147.

Baystate asserted at trial that the CADKEY source code, the Part File Tool Kit source code and the Part File Tool Kit documentation are, in fact, trade secrets and that both Baystate and Cadkey took reasonable steps to protect those secrets. Baystate claimed that Cadkey, and later Baystate itself, required that anyone who was granted access to the CADKEY source code sign a non-disclosure agreement.

### 1. Trade Secret Misappropriation of Source Code

■ Based upon all the evidence offered at trial, this Court concludes that plaintiff has not met its burden of proving that the CADKEY source code and the Part File Tool Kit Source Code were misappropriated by either Infotech or Bentley. Mr. Reddy testified that Infotech did not receive either source code until November, 1994, which was after it had developed CADKEY "read" capability for MODES. He also indicated that Infotech did not use or refer in any manner to either source code in the development of the Translator. That testimony was credible

and plaintiff did not adequately rebut it. With respect to any trade secret misappropriation claim related to the CADKEY source code or the Part File Tool Kit source code, this Court, therefore, rules in favor of defendant.

### 2. Trade Secret Misappropriation of Information in the Documentation

■ Infotech admits referring to the Part File Tool Kit documentation in its development of the CADKEY "read" capability in MODES which, in turn, was used in the development of the Translator. Plaintiff maintains, primarily on the basis of the testimony of Livingston Davies, that Infotech's use of such documentation was authorized by an agreement whereby Infotech acknowledged the confidential nature thereof and accepted the restriction of its use to the development of MODES. If such an agreement was entered into, then the use of MODES in the Translator would constitute a misappropriation of Baystate's trade secrets. This Court concludes, however, that 1) there was no such agreement, 2) Cadkey's policies, as they related to the Part File Tool Kit documentation, failed to preserve its trade secret nature and, therefore, 3) plaintiff's claim of trade secret misappropriation of such documentation fails.

### a. Factors to Consider When Determining Reasonableness of Steps Taken to Preserve Secrecy

This Court notes that the subject documentation contained the kind of information generally considered to be a trade secret if secrecy is maintained. It thus considers the reasonableness of the steps taken by Cadkey, and later by Baystate, to preserve the secrecy of the information at issue. Whether reasonable steps have been taken depends upon the facts of each case. However,

> one who claims that he has a trade secret must exercise eternal vigilance. This calls for constant warnings to all persons to whom the trade secret has become known and obtaining from each an agreement,

preferably in writing, acknowledging its secrecy and promising to respect it.

*J.T. Healy,* 357 Mass. at 738, 260 N.E.2d 723.

To determine whether Cadkey's actions and policies concerning the treatment of the documentation were sufficient to protect its claimed secrecy, this Court considers four factors as suggested by the Massachusetts Supreme Judicial Court in *USM Corp. v. Marson Fastener Corp.,* 379 Mass. 90, 393 N.E.2d 895 (1979):

(1) the existence or absence of an express agreement restricting disclosure;

(2) the nature and extent of security precautions taken by the possessor to prevent acquisition of the information by unauthorized third parties;

(3) the circumstance under which the information was disclosed ... to the extent they give rise to a reasonable inference that further disclosure, without the consent of the possessor, is prohibited; and

(4) the degree to which the information has been placed in the public domain or rendered "readily ascertainable".

*USM Corp.,* 379 Mass. at 98, 393 N.E.2d 895.

b. *No Agreement between Cadkey and Infotech*

With respect to the *USM Corp.* "factors", this Court has already found that no express written or oral agreement existed between Mr. Reddy and Livingston Davies as to the trade secret nature of the documentation which Livingston Davies delivered to Mr. Reddy in June, 1994. No written agreement was offered at trial and Mr. Reddy denied that there were any discussions regarding an oral agreement. That testimony was credible, but if there existed an implied duty, reasonably inferred from surrounding circumstances, to maintain the secrecy of the documentation, that nonetheless, would be sufficient.

The documentation Mr. Reddy received was stamped "confidential" on all pages. He knew, therefore, that the documentation was confidential, but no evidence was presented that anyone at Infotech knew such documentation represented Cadkey trade secret information or that Infotech agreed to maintain the confidentiality of such information. Moreover, there was no evidence that Infotech ever disclosed to anyone else the Part File Tool Kit documentation. What it disclosed to Bentley through the Translator source code was the MODES computer program which was created by reference to such documentation.

Although Mr. Reddy admitted that he knew any source code he received was confidential, he did not consider Infotech's use of the documentation to be use of source code. This Court concludes that there was insufficient evidence to find any express or implied agreement by Infotech not to disclose programming that was created by reference to the confidential documentation. If that had been Cadkey's intention, Cadkey should have put it in writing.

c. *Cadkey's Policies Failed to Preserve Secrecy*

Whether or not Cadkey took reasonable steps to protect its trade secrets in its dealings with Infotech in 1994, this Court concludes that Cadkey did not maintain the trade secret nature of the Part File Tool Kit documentation in its dealings with others. Although Livingston Davies denied that, as Chairman of the Board, he ever approved such a policy, George Krucik, vice president of Cadkey in 1994, testified via deposition that he implemented a policy whereby the Tool Kit documentation (and even the Tool Kit source code) was distributed without restriction to requesting third party developers. No evidence was offered at trial that such a policy was ever acted upon, but Ronald Brumbarger, a credible and objective witness, testified that while his company was handling the implementation of one part of the CADKEY program, he and his employees understood they were free to disseminate the Part File Tool Kit without restriction to those who asked for it.

Evidence was also presented that Scott Taylor received the Part File Tool Kit documentation from Cadkey. He indicated that, on a handshake, he agreed that the documentation was confidential and that he would not disclose it to anyone else. He testified that

he has not, in fact, disclosed it to anyone else, but has referred to it (seemingly in much the same way Infotech admitted referring to it) in the production of several data translators which were sold by his company.

Finally, with respect to the confidentiality agreements that refer to the Part File Tool Kit and are in evidence, none says specifically that further disclosure of the information in the documentation is prohibited by the agreement. Furthermore, one such agreement states specifically that the confidentiality agreement between the parties (Cadkey and Amdahl Corporation) was to expire on August 1, 1995. Exh. 17. At a very minimum, therefore, the Part File Tool Kit documentation is "readily ascertainable" from Amdahl Corporation which could presumably disseminate such information without restriction. *USM Corp.*, 379 Mass. at 98, 393 N.E.2d 895.

Considering all of the *USM Corp.* factors, this Court concludes that Cadkey did not take reasonable steps to preserve the trade secrecy of the Part File Tool Kit documentation. Because Baystate acquired only what Cadkey had to sell, Baystate has no trade secret protection in the documentation. The defendant therefore prevails on plaintiff's claim of trade secret misappropriation.

### C. *The Lanham Act Claim*

 Under the Lanham Act, a party who, in connection with any goods, uses any false or misleading representation of fact in commercial advertising which misrepresents the nature, characteristics or qualities of the goods, is liable in a civil action to anyone who is injured by such conduct. 15 U.S.C. § 1125(a). The purpose of the Act is to protect against the "use of a mark in interstate commerce which is likely to cause confusion or to deceive purchasers concerning the source of goods" or, in the alternative, the false description or representation of goods in commerce. *Quincy Cablesystems, Inc. v. Sully's Bar, Inc.*, 650 F.Supp. 838, 845 (D.Mass.1986).

The Court finds that there is nothing deceptive or misleading about Bentley's advertisement for the Translator. What little evidence was offered with respect to the Lanham Act claim showed that the development and marketing of translators is common in the CAD industry and that CAD users are familiar with translators and would not therefore be confused about the source thereof.

Baystate apparently also claims that Bentley has misrepresented that it has a right to sell the Translator.[7] Because Bentley's development and sale of the Translator has herein been found to be lawful, this Court concludes that no misrepresentation occurred.

### D. *Conversion Claim*

 Conversion is the wrongful exercise of an act of ownership or control over another's personal property. *Third Nat. Bank of Hampden County v. Continental Ins. Co.*, 388 Mass. 240, 244, 446 N.E.2d 380 (1983); *Spooner v. Manchester*, 133 Mass. 270, 274 (1882). The evidence shows and this Court concludes that the defendant has not exercised any act of ownership or control over any personal property of Baystate.

### E. *Claim for Tortious Interference with Advantageous Business Relations*

 Liability for tortious interference with an advantageous business relationship requires that such interference be intentional and unjustified. *Backman v. Guiliano*, 331 Mass. 231, 232, 118 N.E.2d 78 (1954). This Court determines that, even if Bentley had interfered with Baystate's relationship with Infotech, it was unintentional. Bentley made a reasonable effort to ensure that Infotech developed the Translator without the use of proprietary information of any third party. Moreover, Baystate voluntarily terminated its relationship with Infotech despite Infotech's assurances that it had done nothing wrong and its expressed desire to continue the relationship. This Court concludes that no tortious interference with an advantageous business relationship has, therefore,

---

**7.** Although some circuits have extended the Lanham Act to protect against that kind of misrepresentation, it is not clear that the First Circuit is among them. *See Id.* at 846.

**1094**

occurred and rules in favor of defendant on that claim.

### F. *Unfair and Deceptive Trade Practices*

To sustain its claim under M.G.L. c. 93A, Baystate must show that Bentley knowingly and willfully engaged in an unfair and deceptive trade practice. Because plaintiff has failed to meet its burden of proof on any of the previously discussed claims, it has also failed to meet its burden on this claim.

### CONCLUSION

For the foregoing reasons, this Court concludes that defendant, Bentley, did not infringe Baystate's copyright, did not misappropriate Baystate's trade secrets, did not violate the Lanham Act with respect to its advertisements for a CADKEY–to–Microstation translator, did not unlawfully convert any of Baystate's property, did not tortiously interfere with an advantageous business relationship between Baystate and Infotech and did not engage in unfair or deceptive trade practices with respect to the issues presented at trial. Judgment will, therefore, be entered in favor of the defendants, plaintiff is not entitled to the injunctive relief requested and plaintiff's claims are dismissed.

SO ORDERED.